[No. J.D. 3. En Banc. May 7, 1987.]

*In the Matter of the Disciplinary Proceeding Against* MARK S. DEMING, *Judge of District Court No. 1, Pierce County.*

*Riddell, Williams, Bullitt & Walkinshaw,* by *David D. Hoff,* for Commission on Judicial Conduct.

*Reed & Wright,* by *Frank C. Wright (Douglas L. Applegate,* of counsel), for the Judge.

*John A. Strait* on behalf of the Bar Association, amicus curiae.

CALLOW, J.—This case involves judicial disciplinary proceedings against District Court Judge Mark S. Deming. In this case, for the first time, the Judicial Qualifications Commission held a public hearing regarding allegations of misconduct made against a judge. Since this appeal was argued to this court Judge Deming has resigned. We answer the issues raised because of their substantial public importance. Our de novo review indicates that Judge Deming's conduct did not comport to the standards of conduct imposed on judges in this state. As the final authority which can discipline judges, we find that Judge Deming's

conduct violated the Code of Judicial Conduct and warranted removal from office.

## PROCEDURAL FACTS

On July 3, 1985, the Commission served Judge Deming with a statement of allegations regarding: (a) his personal relationship with a probation department employee; (b) alleged sexual harassment of female employees; (c) threats to the Director of the probation department; and (d) aberrant and unstable courtroom behavior. In response, Judge Deming submitted information which he asserts placed the allegations in context by explaining that the charges were caused by political disputes in the Pierce County District Court system.

On October 21, 1985, the Commission served Judge Deming with a formal complaint which alleged numerous instances of conduct violating the Code of Judicial Conduct, and notice of a fact–finding hearing to be held in December at the University of Washington School of Law. On or about October 27, Judge Deming obtained legal counsel. On October 29, by letter, his counsel objected to the holding of a public hearing and requested an opportunity to appear and present oral argument. Counsel for the Commission advocated a public hearing, arguing by letter that because of the media's substantial coverage of the matter a confidential hearing would not protect Judge Deming, and would harm the public's faith in the judicial system. On November 6, without hearing oral argument, the Commission ordered a public hearing. The Commission then made public the complaint. Judge Deming did not seek relief from this order.

Prehearing discovery and disclosure of witness lists followed. Depositions began on November 18, 1985, and continued until the evening of December 12, the first day of the hearing. Despite the shortness of time, neither counsel asked for a continuance. On December 9, a motion in limine made by counsel for the Commission was granted, excluding testimony about witnesses' sexual histories and certain

statements not made in Judge Deming's presence.

The public fact–finding hearing took place between December 12 and 18, 1985. On January 10, 1986, the Commission filed a unanimous recommendation that Judge Deming be removed from office pursuant to Const. art. 4, § 31 (amend. 71). On February 11, the Commission certified the matter to this court.

On February 25, 1986, the initial counsel for Judge Deming withdrew. Thereafter, Judge Deming, acting pro se, moved for reconsideration and to allow additional evidence. The above motions and a request for oral argument on post–hearing motions were denied by the Commission. On March 8, Judge Deming retained present counsel. On May 28, this court heard oral argument presented by Judge Deming and the Commission.

## I

### STANDARD OF REVIEW

 The Washington Constitution requires this court to conduct a hearing to review the Commission's proceedings and findings. Const. art. 4, § 31 (amend. 71) provides:

> The supreme court may not discipline or retire a judge or justice until the judicial qualifications commission recommends after notice and hearing that action be taken and the supreme court conducts a hearing, after notice, to review commission proceedings and findings against a judge or justice.

A de novo review from which we make our own determination of the law and of the facts is required. *In re Buchanan,* 100 Wn.2d 396, 400, 669 P.2d 1248 (1983). *In re Cieminski,* 270 N.W.2d 321, 326 (N.D. 1978) said:

> [T]he duty, authority, burden and responsibility of determining and making the actual judgment, together with the imposition of whatever penalty may be appropriate or necessary, rests with the Supreme Court. *With this responsibility and power comes the concomitant obligation to conduct an independent inquiry into the evidence to determine whether or not the evidence merits the imposition of any penalty as recommended by the [Commission] or otherwise.*

Accordingly our review, as established by·case law, is de novo on the record. *In the Matter of Heuermann,* 240 N.W.2d 603 (S.D.1976); *In re Hanson,* 532 P.2d 303, 308 (Alaska 1975); *Geiler v. Commission on Judicial Qualifications,* 10 Cal.3d 270, [276], 110 Cal.Rptr. 201, 515 P.2d 1 (1973); and *In re Diener,* 268 Md. 659, 304 A.2d 587 (1973).

(Italics ours.) "[T]he term 'recommend' manifests an intent to leave the court unfettered in its adjudication. This court's constitutional responsibility cannot be abandoned by the delegation of the fact–finding power to an administrative agency or the master." *In re Nowell,* 293 N.C. 235, 246, 237 S.E.2d 246 (1977).

If necessary, supplemental materials may be accepted if they will aid this court. DRJ 7. An "independent evaluation of the evidence" allows maximum flexibility for supplementing the record. Comment, DRJ 7. *In re Kneifl,* 217 Neb. 472, 477, 351 N.W.2d 693, 696–97 (1984) stated:

> From the power to permit the introduction of additional evidence, we conclude that our review is to be de novo. When no new evidence is received, our review must be de novo on the record. *See Matter of Cieminski,* 270 N.W.2d 321 (N.D. 1978). Our duty, then, is to determine upon our own independent inquiry, as to the charges of alleged misconduct referred to us, whether the evidence clearly and convincingly proves that respondent acted in such a manner as to prejudice the administration of justice and bring the judicial office into disrepute. *See In re Conduct of Roth,* 293 Or. 179, 645 P.2d 1064 (1982); *Matter of Heuermann,* 90 S.D. 312, 240 N.W.2d 603 (1976).

Review by this court is not confined only to the record; therefore, our review is to be de novo. Regarding what a "de novo" hearing embraces, in 2 Am. Jur. 2d *Administrative Law* § 698, at 597 (1962), we find:

> A trial or hearing "de novo" means trying the matter anew the same as if it had not been heard before and as if no decision had been previously rendered. . . . Even though designated an "appeal," a review in which the court is not confined to a mere re–examination of the case as heard before the administrative agency but hears

the case de novo on the record before the agency and such further evidence as either party may see fit to produce is to be regarded as an original proceeding. *Thus, on a trial or hearing de novo it has been held immaterial what errors or irregularities or invasion of constitutional rights took place in the initial proceedings.*

(Footnotes omitted. Italics ours.) *See also Aiudi v. Baillargeon,* 121 R.I. 454, 399 A.2d 1240 (1979); *Herzberg v. State ex rel. Humphrey,* 20 Ariz. App. 428, 514 P.2d 966 (1973); *State v. Pollock,* 251 Ala. 603, 38 So. 2d 870, 7 A.L.R.2d 757 (1948); *Fowler v. Young,* 77 Ohio App. 20, 65 N.E.2d 399 (1945); *Cooper v. State Bd. of Med. Examiners,* 35 Cal. 2d 242, 217 P.2d 630, 18 A.L.R.2d 593 (1950); *Commonwealth v. Cronin,* 336 Pa. 469, 9 A.2d 408, 125 A.L.R. 1455 (1939). For almost the first hundred years of statehood the discipline and removal of judges lay with the judiciary itself and with the electorate. Now the judiciary is the only one of the three branches of government for which a separate administrative body has been established to review the performance of its elected officials. The independence of the referees of government must not be compromised nor judges intimidated by a judicial qualifications commission that fails to remember that its dual function is not only to protect the public from judges who violate the Code of Judicial Conduct, but also to protect judges from harassment and meritless complaints. The above principles apply to our analysis of the proceedings below.

II

We turn to the Commission's investigation, prosecution and adjudication of the allegations made against Judge Deming.

CONSTITUTIONALITY OF PUBLIC HEARING

Judge Deming argues that Const. art. 4, § 31 (amend. 71) and RCW 2.64.110 (in the form and wording at the time) mandated that all Commission proceedings be kept confidential and that the holding of a public hearing was

patently unconstitutional. Regarding confidentiality of proceedings, Const. art. 4, § 31 (amend. 71)[1] provided:

> The commission shall establish rules of procedure for commission proceedings including due process and confidentiality of proceedings.

*RCW 2.64.110 provides in part:*

> The commission shall establish rules for the confidentiality of its proceedings with due regard for the privacy interests of judges or justices who are the subject of an inquiry and the protection of persons who file complaints with the commission. Any person giving information to the commission or its employees, any member of the commission, or any person employed by the commission is subject to a proceeding for contempt in superior court for disclosing information in violation of a commission rule.

Pursuant to Const. art. 4, § 31 (amend. 71) and RCW 2.64.110, the Commission promulgated JQCR 4(g):

> If the commission determines that the public interest in maintaining confidence in the judiciary and the integrity of the administration of justice so require, it may order that some or all aspects of the proceeding before the commission may be publicly conducted or otherwise reported or disclosed to the public. The judge will be given notice and an opportunity to be heard on the issue before the commission determines to make a hearing public.

---

[1]The Washington Legislature referred to the people a constitutional amendment which has been adopted and which effects a change in the language relating to confidentiality. SJR 136 (1986 regular session) added the following paragraph:

> Whenever the commission receives a complaint against a judge or justice, it shall first conduct proceedings for the purpose of determining whether sufficient reason exists for conducting a hearing or hearings to deal with the accusations. These initial proceedings shall be confidential, unless confidentiality is waived by the judge or justice, but all subsequent hearings conducted by the commission shall be open to members of the public.

*Retained* in the Constitution was the succeeding paragraph which reads:

> The legislature shall provide for commissioners' terms of office and compensation. The commission shall establish rules of procedure for commission proceedings including due process and confidentiality of proceedings.

Further, the amendment changed the name of the commission to Commission on Judicial Conduct.

Provisions similar to Const. art. 4, § 31 (amend. 71) have been construed to allow some discretion in bodies comparable to the Commission regarding the holding of a public hearing. For example, the Michigan Supreme Court construed Mich. Const. art. 6, § 30(2) not to mandate that all judicial tenure commission hearings be kept confidential.

> The supreme court shall make rules implementing this section and providing for confidentiality and privilege of proceedings.

*In re Probert*, 411 Mich. 210, 223, 308 N.W.2d 773 (1981). Pursuant to this provision, the Michigan Supreme Court enacted a rule providing that Judicial Tenure Commission hearings held subsequent to the filing of a complaint were to be conducted in public. Rule .22, Rules of the Judicial Tenure Commission, Gen. Court R. 932 (1980). The North Dakota Supreme Court likewise made such a determination regarding similar language pertaining to judicial qualification hearings. *See* N.D. Cent. Code § 27–23–03(5); JQCR 4.

If the Legislature had intended Const. art. 4, § 31 (amend. 71) and RCW 2.64.110 to mandate absolute confidentiality it could have used more explicit language.[2] The language of Const. art. 4, § 31 (amend. 71) indicates that some discretion in the Commission as to the holding of a public hearing was intended. The extent of that discretion, however, rests on important concerns favoring confidentiality.

Regarding the need and reasons for confidentiality in judicial disciplinary proceedings, Shaman & Begue, *Silence Isn't Always Golden: Reassessing Confidentiality in the Judicial Disciplinary Process*, 58 Temp. L.Q. 755, 760

---

[2]For example, the following language has been held to mandate confidentiality:

Del. Const. art. 4, § 37 ("*All* hearings and other proceedings of the Court on the Judiciary *shall be private* . . .");

Idaho Code § 1–2103 ("*All* papers filed with and the proceedings before the judicial counsel or masters appointed by the Supreme Court, pursuant to this section, *shall be confidential* . . .");

Md. Const. art. 4, § 4B ("*All* proceedings, testimony, and evidence before the Commission *shall be confidential and privileged* . . ."). (Italics ours.)

(1985) posits:

> Confidentiality is widely considered an essential element of judicial discipline. Proponents of confidentiality maintain that it serves several functions, including: (1) encouraging participation in the disciplinary process by protecting complainants and witnesses from retribution or harassment, and reducing the possibility of subornation of perjury; (2) protecting the reputation of innocent judges wrongfully accused of misconduct; (3) maintaining confidence in the judiciary by avoiding premature disclosure of alleged misconduct; (4) encouraging retirement as an alternative to costly and lengthy formal hearings; and (5) protecting commission members from outside pressures.

(Footnote omitted.) *See also Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 835, 56 L. Ed. 2d 1, 98 S. Ct. 1535 (1978); Comment, *A First Amendment Right of Access to Judicial Disciplinary Proceedings,* 132 U. Pa. L. Rev. 1163, 1181–87 (1984). *In re Inquiry Concerning a Judge,* 333 So. 2d 22, 23 (Fla. 1976) states:

> The need and reasons for confidentiality are: (1) to protect the judicial officer from unsubstantiated charges, and (2) to protect the complainant from possible recriminations, thereby keeping open sources of information. *Confidentiality, however, should not be absolute in these types of proceedings when the reasons for the confidentiality doctrine no longer exist.* This is particularly so when there is public knowledge of the incident, and confidence in the administration of justice is threatened due to the lack of information concerning disciplinary proceedings.

(Footnote omitted. Italics ours.)

During the investigatory phase of an inquiry into alleged misconduct, confidentiality is mandated. Disclosed allegations, even though groundless, could prove damaging not only to a judge's reputation, but also to the administration of justice by adversely affecting a judge's ability to perform his or her duties. In addition, "[e]xoneration rarely commands the same public attention as a charge of wrongdoing." *Rushford v. Civiletti,* 485 F. Supp. 477, 479 (D.D.C.

1980). Therefore, confidentiality during the investigatory phase protects a judge from the disclosure of vexatious and groundless accusations. Two interests conflict and compete to be weighed in the balance. On the one hand there is the interest in maintaining the effectiveness of the judiciary; on the other hand, there is the desire that hearings concerning the qualifications of public officials be conducted in public. After a determination that probable cause supports the allegations and a complaint is filed by the Commission, the solicitude for the protection of the judiciary lessens while the concern for the interests of the public increases. It was only between the time of the filing of a complaint based on probable cause and the time the matter reached this court that discretion in the Commission as to confidentiality was allowed when this proceeding was being conducted.

██ Const. art. 4, § 31 (amend. 71) and RCW 2.64.110 indicate that confidentiality is the norm. RCW 2.64.110 expressly provides for contempt of court proceedings against those who leak or disclose confidential information. Indeed, statements by any person on the Commission or in its employ to the news media or to any other person not in the employ of the Commission concerning a matter under investigation and violative of the statute would not only be contempt of court but a breach of duty as an employee or member of the Commission. Before public disclosure of information and a public hearing was appropriate to these proceedings the following had to have occurred: (1) the filing of a formal complaint against a judge; (2) a finding of probable cause supporting the allegations made against a judge; (3) sufficient public knowledge of the allegations such that (a) a confidential hearing would not serve to protect the interests of the judge, and (b) a public hearing would best provide the judge with an opportunity to confront the allegations made against him or her; (4) a determination that there was no need to protect the complainants from possible recrimination, retribution or harassment, and that a public hearing would not eliminate sources of information; and (5) a determination that confi-

dence in the administration of justice was threatened due to the lack of information concerning the disciplinary proceeding. Additionally, a judge had to be given notice and an opportunity to be heard regarding the holding of a public hearing.[3]

## DUE PROCESS CONSIDERATIONS

The Supreme Court in *Mathews v. Eldridge,* 424 U.S. 319, 333, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976) held that "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 14 L. Ed. 2d 62, 85 S. Ct. 1187 (1965)). *Young v. Konz,* 91 Wn.2d 532, 539, 588 P.2d 1360 (1979) stated:

> In speaking of due process, we have said:
> The essential elements of the constitutional guaranty of due process, in its procedural aspect, are notice and an opportunity to be heard or defend before a competent tribunal in an orderly proceeding adapted to the nature of the case.
>
> *In re Hendrickson,* 12 Wn.2d 600, 606, 123 P.2d 322 (1942).
> Our state system, which provides for nonattorney judges in small sparsely populated areas, only in misdemeanor and gross misdemeanor cases, with de novo review from *all* cases, unless review is voluntarily waived, clearly meets this standard.

*Accord, Shaw v. Vannice,* 96 Wn.2d 532, 537, 637 P.2d 241 (1981); *see also Gnecchi v. State,* 58 Wn.2d 467, 470, 364. P.2d 225 (1961).

De novo review of the Commission's proceeding provided Judge Deming additional due process protection. Nevertheless, it is appropriate to discuss each alleged violation of due process to help insure that each judge against whom a citizen complains will receive from the Commission an opportunity to be heard at a meaningful time and in a meaningful manner.

---

[3]Since hearing the oral argument of this cause, SJR 136 has been adopted by the vote of the people. See footnote 1.

A

NOTICE AND OPPORTUNITY TO BE HEARD CONCERNING
THE HOLDING OF A PUBLIC HEARING

The October 21, 1985 letter which the Commission sent to Judge Deming indicated that the applicability of JQCR 4(c)(4) and (g), which pertain to the holding of a public hearing, were being considered and advised that "anything pertaining thereto you wish the Commission to consider should be submitted to the Commission Office by October 31, 1985." This letter alerted Judge Deming of the possibility of a public hearing and was "reasonably calculated to apprise [petitioner] of proceedings which will affect him." *Duffy v. Department of Social & Health Servs.,* 90 Wn.2d 673, 679, 585 P.2d 470 (1978). The notice requirement of due process was met regarding the holding of a public hearing.

In response to the Commission's letter, Judge Deming's counsel submitted a letter asking for oral argument on the matter. The Commission did not allow oral argument. It asserts that oral argument was not necessary because oral argument on a motion is not a due process right. *See Parker v. United Airlines, Inc.,* 32 Wn. App. 722, 728, 649 P.2d 181 (1982), which held that oral argument was not required before the grant of a summary judgment motion because "the trial court's order clearly shows . . . that the trial court considered all pleadings, briefs, and affidavits of the parties." We agree that due process consideration did not require the right of oral presentation. While it might have been helpful to have permitted oral argument on the motion, it was not a requirement of due process that oral argument be permitted.

However, the holding of a public hearing was of major concern and moment to the accused and once it was decided that it would be held, the judge and the judicial system stood to be diminished regardless of the outcome of the hearing. Over the centuries the intangible yet precious value of one's reputation has been recognized.

A good name is better than precious ointment; . . .

*Ecclesiastes* 7:1.

A good reputation is more valuable than money.

Maxim 77, Publilius Syrus, circa 42 B.C.

The purest treasure mortal times afford is a spotless reputation.

W. Shakespeare, *Richard II,* act 2, scene 2, line 177.

Reputation said: If once we sever,
Our chance of future meeting is but vain:
Who parts from me, must look to part forever,
For Reputation lost comes not again.

C. Lamb, *Love, Death and Reputation,* stanza 4.

In *Olympic Forest Prods., Inc. v. Chaussee Corp.,* 82 Wn.2d 418, 422–24, 511 P.2d 1002 (1973), it was stated:

For over a century it has been recognized that "Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." *Baldwin v. Hale,* 68 U.S. (1 Wall.) 223, 233 (1864). The fundamental requisites of due process are "the opportunity to be heard," *Grannis v. Ordean,* 234 U.S. 385, 394, 58 L. Ed 1363, 34 S. Ct. 779 (1914), and "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 94 L. Ed. 865, 70 S. Ct. 652 (1950). Thus, "at a minimum" the due process clause of the Fourteenth Amendment demands that a deprivation of life, liberty or property be preceded by "notice and opportunity for hearing appropriate to the nature of the case." *Mullane,* at 313. Moreover, this opportunity "must be granted at a meaningful time and in a meaningful manner." *Armstrong v. Manzo,* 380 U.S. 545, 552, 14 L. Ed. 2d 62, 85 S. Ct. 1187 (1965).

Synthesizing decisions "representing over a hundred years of effort", the United States Supreme Court recently refined these fundamental requirements of procedural due process into the following standard:

[D]ue process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty

through the judicial process must be given a meaningful opportunity to be heard.

*Boddie v. Connecticut,* 401 U.S. 371, 377, 28 L. Ed. 2d 113, 91 S. Ct. 780 (1971).

However, while the minimal requisites of due process are definite, their form may vary according to the exigencies of the particular situation.

"[D]ue process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. Expressing as it does in its ultimate analysis respect enforced by law for that feeling of just treatment which has been evolved through centuries of Anglo–American constitutional history and civilization, "due process" cannot be imprisoned within the treacherous limits of any formula. Representing a profound attitude of fairness between men and man, and more particularly between the individual and government, "due process" is compounded of history, reason, the past course of decisions, and stout confidence in the strength of the democratic faith which we profess. Due process is not a mechanical instrument. It is not a yardstick. It is a process. It is a delicate process of adjustment inescapably involving the exercise of judgment by those whom the Constitution entrusted with the unfolding of the process.

*Joint Anti–Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 162, 95 L. Ed. 817, 71 S. Ct. 624 (1951). (Frankfurter, J., concurring.)

This flexibility means that "A procedural rule that may satisfy due process in one context may not necessarily satisfy procedural due process in every case." *Bell v. Burson,* 402 U.S. 535, 540, 29 L. Ed. 2d 90, 91 S. Ct. 1586 (1971). The procedural safeguards afforded in each situation should be tailored to the specific function to be served by them. *See Goldberg v. Kelly,* 397 U.S. 254, 267, 25 L. Ed. 2d 287, 90 S. Ct. 1011 (1970). Also, in determining the specific procedures required by due process under any given set of circumstances we must consider:

The precise nature of the interest that has been adversely affected, the manner in which this was done, the reasons for doing it, the available alternatives to the procedure that was followed, the protection

> implicit in the office of the functionary whose conduct is challenged, [and] the balance of hurt complained of and good accomplished . . .
> *Joint Anti–Fascist Refugee Comm. v. McGrath, supra* at 163. (Frankfurter, J., concurring.)

No harm would have occurred had the opportunity for oral argument been granted. Great harm could have resulted from its refusal.

■ We conclude that (a) oral argument was not required by due process, (b) it would have been preferable to grant oral argument to the accused for his protection and (c) the lack of oral argument did not prejudice him. The allegations against Judge Deming had been carried by the news media throughout the state, especially in Pierce County. A private hearing would not have spared him from the disclosure of the allegations. Further, the holding of a private hearing would have damaged the public's confidence in the administration of justice and led to suspicions as to the objectiveness of the hearing. A public hearing provided Judge Deming with the best opportunity to confront the allegations and clear his name. The harm done, if any, cannot now be undone by the holding of a private hearing. A remand on this issue would serve no purpose. Given that this case is one in which a public hearing was appropriate in light of the aforementioned concerns, the fact that Judge Deming was not allowed to present oral argument regarding the holding of a public hearing did not amount to a prejudicial due process violation.

## B
### NOTICE OF THE CHARGES

■ The notice requirements relating to the Commission proceedings are set forth by JQCR 6(b).[4] We interpret

---

[4]JQCR 6(b) provides:

 The judge who is the subject of a preliminary investigation will be notified by the commission within 7 days after the filing of a verified statement. The judge shall also be advised of the nature of the charge, and, in the discretion of the commission, the name of the individual making the verified statement, if any, or that the investigation is on the commission's own motion.

JQCR 6(b) to mean that the accused judge, prior to the preliminary hearings held to determine the existence of probable cause, is entitled to a copy of the specific charges brought against him and a list of the witnesses to be called. Furthermore, pursuant to JQCR 6(c), the judge is entitled to be present at the preliminary probable cause hearing and may present evidence to rebut the allegations and charges. On July 3, 1985, the Commission provided Judge Deming with a statement of allegations informing him of the investigation and the nature of the charges against him. General and specific allegations were set forth. Judge Deming was able to submit a detailed response to the allegations. In addition, the formal complaint provided him with detailed incidents of alleged improper behavior. Pursuant to JQCR 6(b), petitioner received ample notice of the charge against him.

### C
### THE RIGHT TO PRESENT EVIDENCE AND
### TO CONFRONT ACCUSERS

■ Judge Deming asserts that he was denied the right to present evidence as guaranteed by JQCR 10.[5] He argues

---

Though not challenged in these proceedings, since Judge Deming was fully informed as to the persons bringing the charges, it is improper to place within the discretion of the Commission the decision as to whether the judge complained against should be informed as to the identity of the individuals making the verified statement. While complaints against a judge may not charge criminal violations, they strike at his or her reputation, livelihood and raison d'etre. A judge should be informed of his accusers in order that he or she may know the source and nature of the complaint, and be able to answer it with comprehension. The consideration given a judge should not be less than that given a criminal accused. *See* U.S. Const. amend. 6; Const. art. 1, § 22 (amend. 10).

[5]JQCR 10(a) provides:
"The judge has a right to notice of the allegations concerning the judge which have been found by the commission to warrant a preliminary investigation. The judge shall have the right and reasonable opportunity at a factfinding hearing to defend against the allegations in the complaint by the introduction of evidence. The judge has the privilege against self-incrimination. The judge may be represented by counsel and may examine and cross-examine witnesses. The judge has the right to testify or not to testify on his or her own behalf. The judge has the right to issuance of subpoenas for the attendance of witnesses to testify or

that this right was curtailed by the Commission's ruling on the motion in limine regarding witnesses' sexual histories and certain statements not made in his presence. The application of the Rules of Evidence supports the grant of the motion in limine. Evidence which is not relevant is inadmissible. ER 402. Even if relevant, such evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice. ER 403. The grant of the motion in limine was proper because the witnesses' past sexual histories and certain statements not made in the presence of Judge Deming were not relevant. The proper focus of the inquiry was the conduct of Judge Deming. The past sexual activity of his accusers, if made a subject of inquiry in the public hearing, would have unfairly and irretrievably damaged their own reputations and was irrelevant as to the appropriateness of his conduct. In addition, Judge Deming did not make any offers of proof as to any of the excluded evidence. He also failed to challenge the motion in limine after the Commission granted it.

Judge Deming alleges that the right of confrontation was curtailed by a request that he turn away from a witness during her deposition. The record indicates that petitioner had ample opportunity to present evidence and confront his accusers.

## D
### THE RIGHT TO A PROMPT RESOLUTION
#### OF THE ALLEGATIONS

Judge Deming argues that he was denied the right to a prompt resolution of the allegations in the complaint as guaranteed by JQCR 10(a). He asserts that over 6 months passed between the time the Commission began investigating the matter and the time it filed the formal complaint. To hold that investigations should be limited raises the possibility of a less than thorough investigation. However, when an allegation of judicial misconduct has been made

produce evidentiary matters. The judge has the right to a prompt resolution of the allegations in the complaint."

against a judge, two considerations come into play. If the allegations have merit as a violation of the Code of Judicial Conduct, they should be speedily investigated and a formal complaint filed. If the allegations are without merit, they should be speedily dismissed. A judge who is violating the Code of Judicial Conduct should be disciplined as soon as possible so that the inappropriate practice will be stopped. A judge who is unfairly accused has a right to a prompt resolution of the allegations considered under JQCR 5 and to a prompt investigation under JQCR 6.

◼ The record before us and the findings of the Commission reflect that a number of the improprieties which occurred took place in 1983 and 1984, yet formal charges were not filed until July 3, 1985. If prejudice could be shown from such a delay, dismissal of the charges would be proper. However, once the charges were filed, the Commission moved with appropriate dispatch. Once an investigation has been completed, a judge is entitled to a speedy closing of the file or a prompt filing of charges with a hearing to follow within a reasonable time. In July 1985, the Commission informed Judge Deming of the nature of the charges. He responded in August. The Commission filed its complaint in October. The hearing was held in December. We find 90 days to be a reasonable time in these circumstances. Following the hearing Judge Deming received a prompt resolution of the allegations. Judge Deming also contends that he was given inadequate time to prepare for the hearing. We reject this argument because at no time was a continuance requested.

E

THE ATMOSPHERE OF THE FACT–FINDING HEARING

Judge Deming asserts the public fact–finding hearing was conducted in a "circus" atmosphere. The purpose of a public hearing is not to be educational or entertaining to the onlookers but to ascertain the truth. The hearings could have been conducted with greater decorum, but this fact does not require a remand. First, Judge Deming contends

that witnesses were not properly excluded. However, he never asked for the exclusion of witnesses. *See* ER 615. Second, the interruptions ended after the Commission admonished the persons making them. Such interruptions are possible at any trial or hearing and we do not see how petitioner was prejudiced. Third, the acknowledgment of the presence of the media by the Commission did not prejudice Judge Deming. His counsel acknowledged the media as well.

F

### THE AUTHORITY OF THE COMMISSION

█ DRJ 12(a) provides that "[t]he commission may informally admonish or reprimand a judge, but only with the agreement of that judge." Judge Deming asserts that the holding of a public hearing amounted to a public censure; therefore, the Commission exceeded its authority. The holding of the public hearing did not usurp this court of its power to impose the appropriate sanction. As the imposition of censure, suspension or removal remains solely with this court, we do not find that the Commission exceeded it authority.

G

### CONCLUSION

We find that Judge Deming had an opportunity to be heard at a meaningful time and in a meaningful manner. The infirmities of the Commission's proceeding were not such that the additional due process protection provided by the de novo review by this court cannot act to cure them. We add, however, that even though a judicial disciplinary proceeding is not criminal in nature, because of the potentially severe consequences to a judge, certain due process protections are required. Every judge charged by the Commission is entitled to: (1) notice of the charge and the nature and cause of the accusation in writing; (2) notice, by name, of the person or persons who brought the complaint; (3) appear and defend in person or by counsel; (4) testify in his own behalf; (5) the opportunity to confront witnesses

face to face; (6) subpoena witnesses in his own behalf; (7) be apprised of the intention to make the matter public; (8) appear and orally argue the merits of the holding of a public hearing; (9) prepare and present a defense; (10) a hearing within a reasonable time; (11) the right to appeal.[6]

 We hold that a judge accused of misconduct is entitled to no less procedural due process than one accused of crime. *See* U.S. Const. amends. 5, 6, 14; Const. arts. 1, § 22 (amend. 10), 4, § 31 (amend. 71). The lawyer charged with misconduct in a disbarment proceeding is entitled to procedural due process. *In re Ruffalo,* 390 U.S. 544, 550, 20 L. Ed. 2d 117, 88 S. Ct. 1222 (1968). As stated therein:

> Disbarment, designed to protect the public, is a punishment or penalty imposed on the lawyer. . . . He is accordingly entitled to procedural due process, which includes fair notice of the charge. . . . Therefore, one of the conditions this Court considers in determining whether disbarment by a State should be followed by disbarment here is whether "the state procedure from want of notice or opportunity to be heard was wanting in due process."

A judge is entitled to the same procedural due process protection when facing disqualification as a lawyer facing disbarment.

Justice William O. Douglas, concurring in *Joint Anti–Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 177–80, 95 L. Ed. 817, 71 S. Ct. 624 (1951), stated:

> It is not enough to know that the men applying the standard are honorable and devoted men. This is a government of *laws,* not of *men.* The powers being used are the powers of government over the reputations and fortunes of citizens. In situations far less severe or important than these a party is told the nature of the charge against him. . . . When the Government becomes the moving party and levels its great powers against the citizen, it should be held to the same standards of fair dealing as we prescribe for other legal contests. To let the

---

[6]As observed by footnote 1, the adoption of SJR 136 and the resulting constitutional change removes items (7) and (8) as procedural steps.

Government adopt such lesser ones as suits the convenience of its officers is to start down the totalitarian path.

. . .

Notice and opportunity to be heard are fundamental to due process of law. We would reverse these cases out of hand if they were suits of a civil nature to establish a claim against petitioners. Notice and opportunity to be heard are indispensable to a fair trial whether the case be criminal or civil. . . . The rudiments of justice, as we know it, call for notice and hearing—an opportunity to appear and to rebut the charge.

. . .

It is not without significance that most of the provisions of the Bill of Rights are procedural. It is procedure that spells much of the difference between rule by law and rule by whim or caprice. Steadfast adherence to strict procedural safeguards is our main assurance that there will be equal justice under law. . . .

. . .

The Loyalty Board convicts on evidence which it cannot even appraise. The critical evidence may be the word of an unknown witness who is "a paragon of veracity, a knave, or the village idiot." His name, his reputation, his prejudices, his animosities, his trustworthiness are unknown both to the judge and to the accused. The accused has no opportunity to show that the witness lied or was prejudiced or venal. Without knowing who her accusers are she has no way of defending. . . .

Dorothy Bailey was not, to be sure, faced with a criminal charge and hence not technically entitled under the Sixth Amendment to be confronted with the witnesses against her. But she was on trial for her reputation, her job, her professional standing. A disloyalty trial is the most crucial event in the life of a public servant. If condemned, he is branded for life as a person unworthy of trust or confidence. To make that condemnation without meticulous regard for the decencies of a fair trial is abhorrent to fundamental justice.

(Footnotes and citations omitted.) The sentiments expressed by Justice Douglas apply with equal force here.

## THE APPEARANCE OF FAIRNESS

Judge Deming argues that the appearance of fairness doctrine provides procedural protections beyond the mini-

mum requirements of due process. The issue presented raises due process considerations. The application of the appearance of fairness doctrine is inappropriate here. *State Med. Disciplinary Bd. v. Johnston*, 99 Wn.2d 466, 663 P.2d 457 (1983). As to the combination of functions in one agency, it was stated:

> [W]e detect no inherent unfairness in the mere combination of investigative and adjudicative functions, without more, that would prompt invocation of the appearance of fairness doctrine. The bare fact that the same administrative adjudicators also are clothed with investigative powers does not mean the case will be decided on an improper basis or that there will arise a prejudgment on the ultimate issues. We must presume the board members acted properly and legally performed their duties until the contrary is shown. *Hoquiam v. PERC*, 97 Wn.2d 481, 646 P.2d 129 (1982); *Rosso v. State Personnel Bd.*, 68 Wn.2d 16, 20, 411 P.2d 138 (1966). We are convinced the mere combination of adjudicative and investigative powers in one agency, without more, would not be viewed by a reasonably prudent and disinterested observer as denying any party a fair, impartial, and neutral hearing.

*Johnston*, at 479–80. As stated in the concurring opinion by Justice Utter, at page 483, "the appearance of fairness doctrine should consist of no more than importing procedural due process safeguards into quasi–judicial proceedings of legislative bodies." Judge Deming argues that the addition of the prosecutorial function to the adjudicative and investigative functions constitutes the "something more" required by *Johnston* which raises the "specter of unfairness" to any disinterested observer.

In *Johnston* the majority, in several instances, notes that the Board discussed "the concentration of investigatory, prosecutory, and adjudicatory functions in one body." *Johnston*, at 476. Thus, *Johnston* implies that the combination of investigatory, prosecutory and adjudicatory functions in one body does not necessarily constitute the "something more" which violates due process requirements.

There are important distinctions between this case and *Johnston*. First, the majority of members on the Commis-

sion were attorneys, unlike the medical disciplinary board members in *Johnston.* Courts in other jurisdictions have rejected similar challenges to judicial boards and commissions. *See, e.g., Withrow v. Larkin,* 421 U.S. 35, 43 L. Ed. 2d 712, 95 S. Ct. 1456 (1975); *In re Rome,* 218 Kan. 198, 542 P.2d 676 (1975); *In re Hanson,* 532 P.2d 303 (Alaska 1975). *Nicholson v. Judicial Retirement & Removal Comm'n,* 562 S.W.2d 306 (Ky. 1978), rejecting that the mere combination of all three functions in a single body violated due process, held that respondent had failed to overcome "the presumption of honesty and integrity of the members of the Commission, most of whom are members of the bench or bar and cognizant of the proper standards applicable at each stage of the proceedings." *Nicholson,* at 309. Second, the Commission only has authority to make recommendations. In *Johnston,* the board had the power to impose sanctions. *In re Nowell,* 293 N.C. 235, 244, 237 S.E.2d 246 (1977) held that "[a]n agency which has only the power to recommend penalties is not required to establish an independent investigatory and adjudicatory staff." *See also Richardson v. Perales,* 402 U.S. 389, 28 L. Ed. 2d 842, 91 S. Ct. 1420 (1971). Third, Commission rules provide safeguards against bias and prejudgment. For example, Judge Deming had the opportunity to file an affidavit of prejudice against any Commission member pursuant to JQCR 9(b) and to peremptorily challenge one Commission member pursuant to JQCR 9(c). He did not take advantage of this opportunity. Last, the investigation and prosecution of this case was conducted by staff personnel who should not participate in the decisionmaking process and who, from the record, did not do so. This separation is proper. *See In re Diener,* 268 Md. 659, 304 A.2d 587 (1973), *cert. denied sub nom. Broccolino v. Maryland Comm'n on Judicial Disabilities,* 415 U.S. 989 (1974). The distinctions between this case and *Johnston* support a holding that the requirements of due process have not been violated.

 The failure to strictly adhere to a complete separation of the investigatory, prosecutory and adjudicatory

phases is not always a violation of due process.

> The concentration of functions in a single agency may be unfortunate and subject to much criticism, but where it has been designed by the Legislature and generally comports with notions of fairness and due process, it is almost uniformly upheld. *See Withrow v. Larkin,* [421 U.S. 35, 43 L. Ed. 2d 712, 95 S. Ct. 1456 (1975)]; *Kennecott Copper Corp. v. FTC,* 467 F.2d 67, 79 (10th Cir. 1972), *cert. denied,* 416 U.S. 909, 40 L. Ed. 2d 114, 94 S. Ct. 1617 (1974). *See generally* B. Schwartz, *Administrative Law* § 111 (1976).

*Johnston,* 99 Wn.2d at 477. The record supports the conclusion that here the adjudicatory function was separated from the investigatory and prosecutorial function. We find no due process violation. *Johnston* is controlling.

### EFFECTIVE ASSISTANCE OF COUNSEL

Judge Deming asserts that he did not have the effective assistance of counsel at the public hearing. He argues that initial counsel's consistent inaction and neglect cannot be dismissed as trial tactics upon which attorneys frequently, if ever, differ or disagree.

 A reversal based on ineffective assistance of counsel has two components. First, counsel's performance must fall below an objective standard of reasonableness. The losing party carries the burden of proof that counsel's performance was deficient. Second, the defendant must show that the deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 692, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). In applying this 2-prong test, judicial scrutiny must reconstruct the circumstances of counsel's challenged conduct and determine whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland,* at 691-96. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* at 694.

The record reveals that initial counsel's alleged deficiencies and unprofessional errors did not alter the outcome of

the proceeding. Initial counsel gave no guaranty of a successful or a letter–perfect defense. *See State v. Rhoads,* 101 Wn.2d 529, 535–36, 681 P.2d 841 (1984); *In re Richardson,* 100 Wn.2d 669, 675, 675 P.2d 209 (1983); *State v. Renfro,* 96 Wn.2d 902, 909, 639 P.2d 737, *cert. denied,* 459 U.S. 842 (1982). There has been no showing that original counsel's performance prejudiced the defense.

## III
### THE CODE OF JUDICIAL CONDUCT

Washington State judges are bound to abide by the Code of Judicial Conduct. Canon 1 of that Code provides:

An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this code should be construed and applied to further that objective.

Canon 2 provides:

(A) A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
(B) A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others; nor should he convey or permit others to convey the impression that they are in a special position to influence him. He should not testify voluntarily as a character witness.

Canon 3(A)(3) provides:

A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom he deals in his official capacity, and should require similar conduct of lawyers, and of his staff, court officials, and others subject to his direction and control.

Canon 3(B)(1) provides:

A judge should diligently discharge his administrative responsibilities, maintain professional competence in judicial administration, and facilitate the performance of

the administrative responsibilities of other judges and court officials.

Canon 3(C)(1) provides:

A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned . . .

The application of the Code of Judicial Conduct pertains to a judge's performance of his or her judicial office and any activity undertaken in the performance of that office.

### EVIDENCE SUPPORTING JUDGE DEMING'S VIOLATION OF THE CODE

 In a judicial disciplinary proceeding, the applicable standard of proof is "clear, cogent and convincing evidence." JQCR 14(d). Clear, cogent and convincing evidence is evidence which is weightier and more convincing than a preponderance of the evidence, but which need not reach the level of "beyond a reasonable doubt." *Davis v. Department of Labor & Indus.,* 94 Wn.2d 119, 126, 615 P.2d 1279 (1980); *Bland v. Mentor,* 63 Wn.2d 150, 385 P.2d 727 (1963). Judge Deming contends that this high standard of proof requires more than one person's word against another. *In re McDonough,* 296 N.W.2d 648, 692 (Minn. 1979) rejects such a contention, stating:

The clear and convincing standard arises from an appreciation of the gravity of a disciplinary proceeding and the magnitude of the loss to which a disciplined judge is subjected. *No mechanistic corroboration requirement is necessary; uncorroborated evidence may be clear and convincing if the trier of fact can impose discipline with clarity and conviction of its factual justification.* In fact, depending on its source, uncorroborated evidence may be more reliable than that remotely corroborated by a dubious source.

(Italics ours.)

We turn to whether clear, cogent and convincing evidence supports the conclusion that Judge Deming violated the Code of Judicial Conduct.

 The Commission alleges that Judge Deming used

his position to attempt to enhance the position of a probation department employee with whom he was involved in a personal relationship. At the time of the incident Judge Deming was probation liaison judge, the judge designated to work most closely with the probation department. He had frequent contact with the Director of the Probation Department, who testified before the Commission as follows:

> I received a phone call from Judge Deming before court, before 9:00 in the morning, and he said, "If you want my continued support as a probation liaison judge, you will promote [name of employee with whom Judge Deming was sexually involved] to the probation supervisor position," and then he said, "Do you understand what I am saying?"

Judge Deming labels this allegation a blatant lie. We find this witness's testimony to be credible when considered with the corroborative testimony of the many other women who testified, as did the Commission which was best suited to observe and determine credibility. Determinations of credibility are to be given considerable weight. *See In re Crowell*, 379 So. 2d 107, 109 (Fla. 1978); *In re Cieminski*, 270 N.W.2d 321, 326 (N.D. 1978). Further, Judge Deming's testimony demonstrates his lack of credibility concerning those areas where we find he violated the Code of Judicial Conduct. The evidence shows that Judge Deming lent the prestige of his office to advance the private interests of another. Such conduct violated Canon 2(B).

Judge Deming also stipulated that in spite of the relationship with the probation department employee, he retained his position as probation liaison judge and allowed his "friend" to appear in his court and make probation recommendations. This clearly raised an appearance of impropriety. The record indicates this relationship was known and talked about at the courthouse. It exacerbated problems within the probation department. One witness testified that Judge Deming's "friend" would use her ongoing relationship with Judge Deming "as a power play to intimi-

date, harass and antagonize other employees in that office."
Another witness testified that flirtatious comments made to
her by Judge Deming always increased his "friend's" hos-
tility toward her. Two members of the probation depart-
ment quit because of the harassing and retaliatory behavior
of this woman. This relationship had a deleterious effect on
administrative efficiency in the Pierce County District
Court. Allowing his "friend" to appear in his courtroom did
little to promote "confidence in the integrity and impar-
tiality of the judiciary". Judge Deming's actions did not
constitute criminal conduct but to the extent that his
actions affected his judicial performance, as they did, this
violated Canons 2(A), 3(B)(1) and 3(C)(1).

The Commission found that Judge Deming made a myr-
iad of improper and offensive comments and sexual innu-
endos to women, either in public or in his courtroom in the
presence of others. Allegations of sexual harassment were
made by women from four groups: (1) District Court per-
sonnel; (2) Pierce County District Court probation person-
nel; (3) Pierce County Prosecuting Attorney personnel; and
(4) Pierce County Department of Assigned Counsel (DAC).
The witnesses at the public hearing testified as to numer-
ous alleged incidents of sexual harassment and intimida-
tion. We set forth illustrative excerpts but note that these
examples are not exhaustive. A third–year law student, who
worked as a Rule 9 intern for the DAC, testified:

Q Was there ever an occasion in connection with your
duties as a Rule 9 intern that you felt that Judge
Deming acted towards you in an improper manner?
A While I was in court?
Q Either while you were in court or in his chambers or in
the office surrounding his chambers?
A There was. When I was back in chambers one time
trying to get information from Lettie, Judge Deming
came back and asked me if I would come into his
chambers and take my clothes off and bend over.

Regarding this same incident another Rule 9 intern testi-
fied that "She'd come back the day that the incident hap-
pened where he had asked her to take her clothes off and

bend over. She was very upset when she came back to the office." Judge Deming states this incident never happened and that this woman lied because a friend asked her to lie. Judge Deming also explains this testimony by alluding to a plot by a group from the DAC which was vindictive toward him.

A docket clerk for the District Court testified:

Q I wonder if you could describe to the Commission exactly what he did?

A He came out to my desk and he told me to stand up, he wanted to give me a hug and he gave me a hug, and when he did that he reached up very quickly and he unlatched my bra strap.

Q After he unlatched your bra strap, did he make a comment to you?

A He said something to the effect of "Gee, I haven't lost my touch," and he was kind of tickled with himself.

Judge Deming stated unequivocally that this did not happen. He speculated that "other people" talked the docket clerk into lying. He admitted that he has hugged this woman on numerous occasions in a lot of circumstances. Further, he testified that he thinks she lied because of problems she had with Judge Deming's judicial assistant.

A deputy prosecuting attorney testified as follows:

. . . I said, "Judge Deming, I have an order I need for you to sign," and I handed him the order. He read it, and as he was signing it, he still had it in his possession, and he said to me, "Is that a pin?" I looked down at my lapel and I didn't understand what he was talking about. He said, "No. There. Is that a pin?" That was at my breast line, and I had a blouse with buttons on it, and there was a gap so I had pinned it with a safety pin, and the way there was—I mean it was pretty obvious that I had pinned my blouse with a safety pin, and I had looked down, and so then I knew what he was talking about. He said, "Is that because you're so big?" And then he handed me back the order, and I took the order and left.

Judge Deming stated that he did not make this statement and called it an embellishment. This same young woman also testified:

Q Was there a time when you had to testify as a witness in Judge Deming's court?

A Yes.

Q Would you describe on what occasion that was?

A It was a case where I had filed charges of some traffic offense, either a DWI or a licensing offense from the officer's report rather than the officer filing a citation. That was unusual. The citation evidently had been lost, and so I took the report and filed it in our citation form, and there was a question about that.

Q After you testified as a witness in his court, did Judge Deming call you?

A Yes.

Q What did he say to you when he called you?

A He called me and he said that he had reached a heightened state of excitement seeing me on the witness stand.

She further testified:

. . . I was training a deputy who had just been hired on . . . I was showing him that sometimes we have to make xeroxes of things, so we were at the xerox machine, and Judge Deming came in through the doorway right there by the xerox machine. I don't remember if he put his arm around me, but he said to me, "You were great last night," and then he walked off.

This statement is corroborated by two witnesses. Judge Deming alleges that this woman has a bad recollection and that he did not make such a comment to her. Further, if it was said, he states that it was not said in a vacuum.

A probation officer testified as follows:

Q Were there ever any occasions when Judge Deming attempted to touch you in an uninvited manner?

A Yes.

Q Would you describe to the Commission how this occurred?

A In open court three times when I was getting—when I was there on a violation hearing and I was getting ready to leave and another case was coming up, he would ask me to approach the bench, and I would go up there to the little witness stand that he had and he'd stand there like he was going to tell me something. He would ask me to come closer, and I would,

and he would say, "I just wanted to touch you," and he touched me on the arm and then I would leave.

Q How many times did this occur?

A Three.

Q How did you react to these instances?

A I would be embarrassed, and then just walk out and leave.

Q In the summer of 1985 was there an incident that took place in his assistant's office?

A Yes. He would ask me if it was okay if he touched me and I would—I think I said no and he kind of chased me around his clerk's desk. He ended up jumping over the top of one of them to touch me . . .

Judge Deming attributed this woman's "lie" to her involvement with the Director of the Probation Department and the pressures of being a pawn. The Probation Director, this young woman's supervisor, testified:

After she complained [to the Personnel Department about Judge Deming] and Personnel was investigating, I noticed that [she] would—she would be very, very apprehensive about going into the courtroom, so much so that it reached the point she asked a male staff person, Milt Harkness, to accompany her. She felt that Judge Deming did not say those things in front of Mr. Harkness. And I felt so terribly for her that she had to go through that and I just decided not to allow her to go into his courtroom anymore. I transferred all of her cases finally to a lot of the other staff members in the Probation Department.

This testimony indicates that the Probation Director's perception of the situation between this woman and Judge Deming was such that she decided it to be necessary to keep her out of his courtroom. Thus, this probation department employee was unable to properly perform her job.

Another Deputy Prosecuting Attorney testified that at the end of the docket one day Judge Deming said: "'Counselor,' or something to get my attention, and he said, 'I would really like to jump your bones.'" Judge Deming asserted this young woman's statement is taken out of context and that her recollection is erroneous. He admitted,

however, that he remembers a conversation where these words were used.

Yet another young woman, from the DAC, testified about an incident which took place in court:

> . . . I was standing, and His Honor looked over at me and called my name. He said, "[Name]," and I looked up, and he held his hand to his face. There were people on his left. He held his hand to his face, and he winked at me, and then he kissed at me (demonstrating) like that. I looked down. (Noise Interruption) Is that a comment? I looked down and my client said something to the effect, "What's going on," because he saw it. I turned around, and there is a gallery with the people, the defendants, the other defendants, my client was sitting behind me, and they're looking up at me . . .
>
> . . .
> I looked back, and of the people sitting there some of them were glaring at me, and some of them were giggling. Some of them were talking to the people next to them, and in general it was a very confusing and embarrassing position to be put in.

Judge Deming denied that the kisses in court ever happened.

A Rule 9 intern from the DAC testified:

> A I have a cat. I have a cat who had hormone problems. Her hair fell out once. And I was in—I don't remember if I was waiting for arraignments to start or what but I was talking to Lettie Hendrickson and I said, "My cat, her hair fell out and the doctor gave her a shot of hormone," blah–blah–blah.
>
> . . .
> Q So [this conversation] would have been in the Judge's antechamber?
> A Yes.
> Q Go ahead.
> A So Judge Deming walked up and he kind of looked at—he had been listening and he turned around and said, "Well, did you hear the hair fell out of [Name]'s pussy?

This woman also testified:

> Q Did he ever make any comments in court while on the bench that you thought were offensive to you?

A I remember on April 2nd, 1984 I had a case in which all I had to do was get a motion to consolidate clients, an order to consolidate. I had the motion previously and the Judge had granted it, and I have presented the order. So I was sitting there waiting. I had cases in other courtrooms pending, and the prosecutor, Doug Clough (ph. sp.), looked over at me, and I go, "This will be really fast," I was whispering to him, "let me go." So Doug said, "Well, Your Honor, Miss [Name] is here on a matter that will be very quick," at which time he smiled and said, "Oh, she's here for a quickie, uh."

A transcript of Judge Deming's "quickie" comment is in the record. The comment was taped as it was made at the end of a district court proceeding.

Judge Deming asserted that his accusers lied because: other people talked them into lying; of politics and personality disputes; of the pressures of being a pawn; they were part of the pack; they did not like him; or they were "goofy." Judge Deming implied that one witness may have lied because she had talked to the Commission's counsel. Several witnesses asserted that Judge Deming intimated affairs, which he denied in each case. Regarding the testimony of one witness, Judge Deming admitted that he touched her in a hallway but asserted that it was a joke. Several witnesses indicated that they felt unable to respond to Judge Deming's harassment because they were intimidated by his authority.

Judge Deming's explanation of the testimony of his accusers is not credible in view of the overwhelming testimony which contradicts his view of the evidence. The widespread nature of the allegations against Judge Deming discredit any assertion of a plot against him. His attempts to explain the reasons why the witnesses testified as they did ring untrue. He offers no credible reason as to why so many individuals would be vindictive. The totality of the testimony about incidents of sexual harassment is overwhelming. Clear, cogent and convincing evidence supports the conclusion that Judge Deming sexually harassed these

women.

The victims of Judge Deming's inappropriate actions were women who had to appear in his courtroom or were under his supervision and control. His actions were unprofessional, demeaning and embarrassing to the involuntary participants, who suffered varying degrees of anger, anguish, intimidation and humiliation. Judge Deming's sexual harassment and intimidation of women subject to his authority is inexcusable and violates the Code of Judicial Conduct. These actions were all related to the performance of his judicial duties and show a lack of the necessary qualifications to be a judge and were violations of Canons 1, 2 and 3(A)(3).

Judge Deming's conduct while in court or dealing with judicial business cannot be condoned. Whether it reflects a misguided sense of humor, an insecurity, an inability to relate on an acceptable basis with persons of the opposite sex or some other social maladjustment is not material to the issues raised. Nor is it material that we feel a sense of sadness and appreciate the tragic consequences of his lack of social graces, restraint and decorum. The flaw in his judicial temperament is inconsistent with service as a judge.

Comments made by Judge Deming while sentencing defendants were also challenged by the Commission as improper. We do not find that all of the complained of comments merit sanctions. A judge, within reason, is entitled to latitude in his statements to defendants from the bench without being critiqued by others so long as he or she maintains decorum. However, taunts about homosexuality in prison, threats of police brutality, and threats of improper sentencing do not befit the dignity of our judicial system.

### The Appropriate Sanction Is Removal

We must determine the appropriate sanction having found that Judge Deming violated the Code of Judicial Conduct. Three sanctions may be imposed by this court: censure, suspension or removal. Const. art. 4, § 31 (amend.

71).

Judge Deming argues that in view of all of the facts, his misconduct, if any, does not rise to a level warranting removal. He argues mitigating factors make a reprimand or censure more appropriate. The mitigating factors suggested by Judge Deming are: (1) he has acknowledged the inappropriateness of the romantic relationship with the probation department employee; and (2) he fully cooperated with the Commission.

Generally, in determining the appropriate sanction, this court will give serious consideration to the Commission's recommendation. In this case the Commission unanimously recommended removal. However, this court must ultimately decide the appropriate sanction.

> In making this decision, our primary concern will be to provide sanctions sufficient to restore and maintain the dignity and honor of the position and to protect the public from any future excesses. . . . These sanctions must also be sufficient to prevent reoccurrences.

*In re Buchanan,* 100 Wn.2d 396, 400, 669 P.2d 1248 (1983).

In *Buchanan* we censured a judge who we found to have sexually harassed women (both verbally and physically), made racial slurs and retaliated against witnesses who testified against him before the Commission. We indicated that such conduct warrants a strong, if not the strongest, available sanction. *Buchanan,* at 400–01. Censure was the strongest available sanction in *Buchanan* because at the time the sanction was imposed the judge no longer served on the bench.

In *In re Crowell,* 379 So. 2d 107 (Fla. 1979), a judge was removed from office for a pattern of conduct which demonstrated his unfitness to hold judicial office.

> Conduct unbecoming a member of the judiciary may be proved by evidence of specific major incidents which indicate such conduct, or *it may also be proved by evidence of an accumulation of small and ostensibly innocuous incidents which, [taken] together, emerge as a pattern of hostile conduct unbecoming a member of the judiciary.*

*In re Kelly,* 238 So.2d 565, 566 (Fla.1970). While some of Judge Crowell's conduct is subject to varying inferences as to its harmfulness or innocuousness, the evidence as a whole shows a continuing pattern of conduct that does not comport with the standards of impartiality and restraint required of judicial officers.

(Italics ours.) *Crowell,* at 110.

The North Carolina Supreme Court removed a judge from office in *In re Martin,* 302 N.C. 299, 275 S.E.2d 412 (1981) because he made sexual advances toward two female defendants. The court stated at page 316:

[T]he proper focus is on, among other things, the nature and type of conduct, the frequency of occurrences, the impact which knowledge of the conduct would likely have on the prevailing attitudes of the community, and whether the judge acted knowingly or with a reckless disregard for the high standards of the judicial office.

The Wisconsin Supreme Court in *In re Seraphim,* 97 Wis. 2d 485, 294 N.W.2d 485, *cert. denied,* 449 U.S. 994 (1980) found five instances of unsolicited conduct toward certain women, found by the women to be offensive and embarrassing, constituted gross personal misconduct.

While certain of the incidents, viewed individually may not amount to what can be considered gross personal misconduct, taken as a whole respondent's conduct does constitute a violation of Rule 11. It is significant that the panel found respondent's conduct toward each of these women to be wholly unsolicited. . . . [N]ot only did the women find respondent's conduct offensive and embarrassing, but several testified that they were particularly appalled by the fact that a member of the judiciary would act in such a way.

*Seraphim,* at 510. *See also* Brooks, *How Judges Get Into Trouble,* 23 Judge's J. 4, 7 (1984).

■ To determine the appropriate sanction, we consider the following nonexclusive factors: (a) whether the misconduct is an isolated instance or evidenced a pattern of conduct; (b) the nature, extent and frequency of occurrence of the acts of misconduct; (c) whether the misconduct occurred in or out of the courtroom; (d) whether the mis-

conduct occurred in the judge's official capacity or in his private life; (e) whether the judge has acknowledged or recognized that the acts occurred; (f) whether the judge has evidenced an effort to change or modify his conduct; (g) the length of service on the bench; (h) whether there have been prior complaints about this judge; (i) the effect the misconduct has upon the integrity of and respect for the judiciary; and (j) the extent to which the judge exploited his position to satisfy his personal desires.

We find that removal is the appropriate sanction because of the totality of Judge Deming's conduct which violated Canons 1, 2 and 3 of the Code of Judicial Conduct. His conduct has denigrated the respect of the public for the judiciary. Applying the evidence to the above factors we conclude that Judge Deming has demonstrated a lack of those personal and professional qualities which are necessary to qualify one to hold judicial office in the State of Washington. The nature, extent and frequency of the acts of sexual harassment, all involving his judicial position, reflect an unacceptable pattern of behavior. This misconduct occurred both in and out of the courtroom, often in public situations. He exploited his official judicial position, for which there can be no excuse. Nothing in the record suggests that additional time on the bench would result in an end to this inappropriate conduct.

The misjudgment displayed by Judge Deming in allowing a probation department employee, with whom he was engaged in a sexual relationship, to appear in his courtroom is apparent. Especially disturbing is the attempt to use his official position to advance the interests of this person. The impropriety of his conduct is obvious and the impropriety clear.

Judge Deming has acknowledged that at certain times his conduct was inappropriate. However, his general position remains that the allegations made against him stem from a plot instigated by an antagonistic group. Clear, cogent and convincing evidence shows otherwise.

Our decision that the actions of Judge Deming warranted

his removal is based solely on our de novo review of the record and of the additional evidence received. The numerous allegations, which are supported by clear, cogent and convincing evidence in the record, indicate that Judge Deming often engaged in conduct which cannot be condoned. Judge Deming's conduct has irretrievably damaged public confidence in his ability to properly carry out judicial responsibilities. The sanction of removal is necessary to restore and maintain the dignity and honor of the judicial branch of government and best protect the public.

## CONCLUSION

Based on our de novo review of the record we are convinced that clear, cogent and convincing evidence shows that Mark Deming does not possess the standards necessary to qualify him to seek or to hold judicial office. His violations of the Code of Judicial Conduct necessitate disqualification from office and, were he still serving in a judicial capacity, removal.

DOLLIVER, DORE, ANDERSEN, GOODLOE, and DURHAM, JJ., concur.

UTTER, J. (concurring)—With no basis in either the law or the facts, the majority reaches out to overturn a rule of the Judicial Qualifications Commission that was established pursuant to article 4, section 31 (amendment 71) of the Washington State Constitution and RCW 2.64.110. Although its discussion is not necessary to dispose of this case, the majority, without the benefit of argument in either the briefs or oral presentation to the court, also purports to vest judges accused of misconduct with the full panoply of rights afforded by the state and federal constitutions to persons accused of a crime. Its effort is futile as the discussion is clearly dicta and not binding on this court in future cases. I must, therefore, disagree.

In footnote 4 of its opinion, the majority cites JQCR 6(b), which sets forth the notice requirements relating to proceedings by the Judicial Qualifications Commission. The

opinion notes that the issue was not raised by these proceedings because Judge Deming was fully informed of the identity of those bringing charges against him. It then, however, proceeds to disapprove and overrule, sua sponte, the portion of the rule that vests the Commission with discretion to decide whether the judge under investigation should be informed as to the identity of the individuals who have filed verified statements instigating a preliminary investigation. The majority concludes—without explanation or justification—that an accused judge should also receive all the protections afforded by the state and federal constitutions to one accused of a crime. In so doing, the majority has rendered an advisory opinion that contributes nothing to the resolution of the case before the court, and grossly extends constitutional protections available to members of the judiciary. This result is not only unseemly, but it opens this court to the justifiable criticism that it has ignored constitutional precedent in order to grant a measure of self–interested protection to the judiciary not available to any other citizens similarly situated.

The prohibition against rendering advisory opinions is one that has been rigorously observed by this court. Fundamental requirements of standing, justiciability, and the doctrine of mootness all derive from the basic requirement that cases be advanced by plaintiffs with an actual stake in the outcome of a genuine controversy. *See Lawson v. State,* 107 Wn.2d 444, 460, 730 P.2d 1308 (1986); *DiNino v. State ex rel. Gorton,* 102 Wn.2d 327, 684 P.2d 1297 (1984); *Diversified Indus. Dev. Corp. v. Ripley,* 82 Wn.2d 811, 514 P.2d 137 (1973); *Conaway v. Time Oil Co.,* 34 Wn.2d 884, 210 P.2d 1012 (1949); *Adams v. Walla Walla,* 196 Wash. 268, 82 P.2d 584 (1938). The court adheres strictly to this rule, although it has the power to render advisory opinions on those rare occasions where the interest of the public in the resolution of an issue is overwhelming.

It does not do so often; but when a proper case presents itself, this court exercises its discretion and gives its

opinion, even though its judgment will not operate on any controversy between parties before it. *The power to render such opinion should of course be exercised with great reluctance and only when there are urgent and convincing reasons for doing so . . .*

(Italics mine.) *In re Elliott,* 74 Wn.2d 600, 616, 446 P.2d 347 (1968).

In *Citizens Coun. Against Crime v. Bjork,* 84 Wn.2d 891, 895, 529 P.2d 1072 (1975), we stated that the power of the court to render advisory opinions is only to be exercised

where the question presented is one of great public interest *and has been brought to the court's attention in an action wherein it is adequately briefed and argued . . .*

(Italics mine.) *See also State ex rel. Distilled Spirits Inst. v. Kinnear,* 80 Wn.2d 175, 492 P.2d 1012 (1972) and *Seattle v. State,* 100 Wn.2d 232, 668 P.2d 1266 (1983).

No challenge to JQCR 6(b) has been raised, much less briefed by the parties in the instant case. Where, as here, the effect of an advisory opinion is to nullify a rule of a commission delegated rulemaking power by statute under constitutional mandate, this court should adhere closely to the position that a court should not interfere with a rule made by an agency

where its adoption is within the authority conferred by the controlling law, and it is not wholly unreasonable, or such a breach of discretion as to transcend the purpose for which the power to adopt it was conferred. The court will not aid in making or revising a rule, or pass on the wisdom or policy of a rule, or substitute its opinion for that of the administrative body. *It is confined to deciding whether a rule is lawful and reasonable as applied to the facts of a particular justiciable case.*

(Italics mine.) *Robinson v. Peterson,* 87 Wn.2d 665, 668–69, 555 P.2d 1348 (1976).

JQCR 6(b) represents one manifestation of the balance presented in judicial misconduct inquiries that is stressed throughout RCW 2.64.110 and the JQCR: "due regard for

the privacy interest of judges or justices who are the subject of an inquiry *and the protection of persons who file complaints with the commission.*" (Italics mine.) RCW 2.64-.110. Complainants against those in positions of power and authority may be uniquely subject to intimidation and retribution. As illustrated by the facts in the instant case, the Commission may need to rely on those who work within the court system in order to be alerted of instances of misconduct. Vesting the Commission with the discretionary power to keep the name of complainants confidential within the confines of the rights affirmatively granted the accused in JQCR 10(a) accounts for both issues balanced in these cases.

In footnote 4, the majority also declares that a judge accused of official misconduct must be accorded the full panoply of rights due to one accused of a crime. The majority reiterates its assertion at page 103, citing *In re Ruffalo,* 390 U.S. 544, 550, 20 L. Ed. 2d 117, 88 S. Ct. 1222 (1968), which concerned a lawyer facing disbarment procedures. *Ruffalo,* however, made no such assertion concerning the scope of an accused lawyer's rights. Ruffalo had been given *no* notice that his alleged misconduct would be considered a disbarment offense until testimony was completed on all the material facts pertaining to that phase of the case. The cause was reversed because the accused had no notice as to the reach of the grievance procedure or the precise nature of the charges. This is in strong contrast to the instant case, where Judge Deming was made entirely aware of the misbehavior of which he was accused and the potential consequences of an adverse decision. The majority cites at great length to the discussion of the requirements of due process in *Olympic Forest Prods., Inc. v. Chaussee Corp.,* 82 Wn.2d 418, 422–24, 511 P.2d 1002 (1973). However, the majority fails to apply the essential principle of that discussion: that due process is a fluid concept that is measured by the nature of the interest that may be adversely affected. Loss of judicial office simply cannot be

equated with the loss of freedom and rights that threaten a criminal defendant.

PEARSON, C.J., and BRACHTENBACH, J., concur with UTTER, J.

After modification, further reconsideration denied October 9, 1987.