# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE                                   NEWS RELEASE #015

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **15th day of March, 2016**, are as follows:

**BY GUIDRY, J.**:

2015-O -1691        IN RE: JUSTICE OF THE PEACE LEROY J. LAICHE, JR., SECOND JUSTICE
                    COURT, PARISH OF ASCENSION, STATE OF LOUISIANA
                    (Judiciary Commission)

                    Accordingly, for the reasons stated herein, it is ordered,
                    adjudged, and decreed that respondent, Justice of the Peace Leroy
                    J. Laiche, Jr., Second Justice of the Peace Court, Parish of
                    Ascension, State of Louisiana, be, and is hereby, removed from
                    office, and that his office be, and is hereby, declared to be
                    vacant. Further, the respondent is ordered pursuant to La.
                    Sup.Ct. Rule XXIII, § 26 to refrain from qualifying as a
                    candidate for judicial office for five years and until certified
                    by this court as eligible to become a candidate for judicial
                    office. Finally, we cast the respondent with $14,243.80 in costs
                    incurred in the investigation and prosecution of his case.
                    REMOVAL FROM JUDICIAL OFFICE ORDERED.

                    WEIMER, J., dissents and assigns reasons.
                    HUGHES, J., dissents for the reasons assigned by Weimer, J.

## SUPREME COURT OF LOUISIANA

## NO. 2015-O-1691

## IN RE:  JUSTICE OF THE PEACE LEROY J. LAICHE, JR., SECOND JUSTICE COURT, PARISH OF ASCENSION, STATE OF LOUISIANA

## JUDICIARY COMMISSION OF LOUISIANA

**GUIDRY, Justice**

This matter comes before us on the recommendation of the Judiciary Commission of Louisiana (the "Commission") that respondent, Justice of the Peace Leroy J. Laiche, Jr., Second Justice of the Peace Court, Parish of Ascension, State of Louisiana, be removed from office and be ordered to reimburse the Commission the costs incurred in the investigation and prosecution of this matter. The Commission conducted an investigatory hearing, made findings of fact and of law, and determined that respondent violated Canons 1, 2A, 2B, 3A(1), 3A(3), 3A(4), 3A(7), 3B(1) and 3B(2) of the Code of Judicial Conduct, concluding that Justice of the Peace Laiche's misconduct constituted egregious legal errors sufficient to rise to the level of judicial misconduct for which a judge should be removed from office under Article V, Section 25(C) of the Louisiana Constitution. [1]   After

---

[1] The relevant Canons provide in pertinent part:

**Canon 1**. An independent and honorable judiciary is indispensable to justice in our society.  A judge should participate in establishing, maintaining, and enforcing, and shall personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved.

**Canon 2A**. A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

**Canon 2B**. A judge shall not lend the prestige of judicial office to advance the private interest of the judge or others… .

**Canon 3A(1)**. A judge shall be faithful to the law and maintain professional competence in it.

thoroughly reviewing the record before us, we agree with the Commission's findings of facts and conclusions of law, and thus we adopt its recommendation of discipline.

## FACTS and PROCEDURAL HISTORY

Respondent assumed his office in October 2009, and has served continuously since that time. Respondent is an attorney and was admitted to the practice of law in Louisiana in October 1989.[2] This case arises out of respondent's handling of peace bond matters in two unrelated family disputes.

*The LeBlanc/Vignes Matter*: Jennifer LeBlanc Vignes (now Jennifer LeBlanc) and her ex-husband, Robert Vignes, Jr., were involved in a heated and very unpleasant child custody case pending in East Baton Rouge Parish Family Court. The custody situation, and especially the exchange of the parties' minor child, were the source of many altercations between the Vignes family and the LeBlanc family. Following one of many such altercations, Ms. LeBlanc and her father, Carrol LeBlanc, filed applications for peace bonds in Ascension Parish against Robert Vignes, Jr., his parents, Eileen and Robert Vignes, Sr., and his

---

**Canon 3A(3)**. A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity, and should require similar conduct of lawyers, and of staff, court officials, and others subject to the judge's direction and control.

**Canon 3A(4)**. A judge shall perform judicial duties without bias or prejudice.

**Canon 3A(7)**. A judge shall dispose of all judicial matters promptly, efficiently, and fairly.

**Canon 3B(1)**. A judge shall diligently discharge the judge's administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration... .

**Canon 3B(2)**. A judge shall require staff, court officials and others subject to the judge's direction and control to observe the standards of fidelity and diligence that apply to the judge and to refrain from manifesting bias or prejudice in the performance of their official duties.

[2] In October 2004, respondent's license to practice law was suspended by this court for ninety days for failing to properly supervise his non-lawyer staff and failing to ascertain the true date of his client's accident, resulting in the prescription of the client's case. *In re: Laiche*, 04-1363 (La. 10/15/04), 885 So. 2d 524.

fiancée, Kacie O'Banion.[3] Over the next several years respondent issued multiple peace bond orders and judgments against the Vigneses and Ms. O'Banion, many without affording them a hearing or an opportunity to be heard, required them to post multiple peace bonds or be imprisoned, and failed to timely refund peace bonds that had expired without forfeiture.

The Office of Special Counsel ("OSC") received complaints in this matter from Kathleen Wright (the sister of Mrs. Eileen Vignes), Ms. O'Banion, and Mr. Vignes, Jr. Respondent was notified of the complaints and filed responses to each. Thereafter, the Commission authorized an investigation of the complaints.

*The Henderson Matter*: Marvin Reid Henderson, Sr. died in March 2011. Within a week of Mr. Henderson's death, his children, Helen Henderson Volpe and Marvin Reid Henderson, Jr., sought peace bonds against their stepmother, Antoinette Henderson, accusing her of inappropriate behavior following Mr. Henderson's death, including at his memorial service. Gina Guidry, the daughter of Antoinette Henderson, attended the peace bond hearing as a witness for her mother and was alarmed and disturbed by respondent's conduct.

In April 2011, Ms. Guidry filed a complaint against respondent with the OSC. Respondent was notified of the complaint and filed a response. Thereafter, the Commission authorized an investigation of the complaint.

---

[3] In her summary of the case, the Hearing Officer noted that the underlying facts cast a negative light on the Vignes family and their treatment of Ms. LeBlanc, and that "it would be tempting to use the actions of the Vignes family to call into question their allegations against JP Laiche and their overall credibility." However, the Hearing Officer found the voluminous exhibits introduced by the Office of Special Counsel served as the primary source of evidence, and as such, the credibility of the testimony of Mrs. Eileen Vignes and Mr. Robert Vignes, Jr. "is less important than the underlying facts (as supported by the exhibits)." The Commissioners agreed with the Hearing Officer's analysis. Our review of the record supports the Hearing Officer's credibility determinations and factual findings, as modified by the Commission.

In November 2013, following its investigation of the LeBlanc/Vignes matter and the Henderson matter, the Commission filed a Formal Charge against respondent. As filed, the Formal Charge contained six counts.

Respondent filed exceptions with his answer to the Formal Charge. The Commission granted an exception as to Count Four only, and denied respondent's exceptions as to all other counts. In April 2014, Count Four was amended to remove any allegation that respondent was motivated by a desire to advance his personal interests or the personal interests of others. The Hearing Officer considered only Amended Count Four, as did the Commission. Accordingly, we will do the same.

After respondent answered the Formal Charge, a hearing officer was appointed to conduct proceedings pursuant to Supreme Court Rule XXIII, § 29. The Hearing Officer convened a hearing over four days in July 2014. After the hearing, the Hearing Officer left the record open (1) to permit the parties to take the deposition of an out-of-state witness, and (2) to allow respondent time to produce additional evidence (which was never produced). After the hearing and deposition, the Hearing Officer filed a report with the Commission containing proposed findings of fact and conclusions of law. Respondent then appeared before the Commission in March 2015.

At the conclusion of these proceedings, the Commission filed its recommendation in this court on September 15, 2015. The Commission found that respondent repeatedly abused and exceeded his judicial authority, used his office to advance his own personal interests, demonstrated bias and prejudice, exhibited incompetence and gross negligence in the oversight of his office, and exhibited inappropriate judicial temperament and demeanor. In the LeBlanc/Vignes matter, he imposed unlawful jail sentences on two individuals for failing to post peace

4

bonds, issued peace bond orders and judgments that interfered with an ongoing custody case in another parish, repeatedly extended the terms of peace bonds beyond the maximum term allowed by law and without conducting hearings, and failed to timely refund peace bond monies after peace bonds expired without a forfeiture, including losing track of $2,000 of peace bond money for over two years in his attorney trust account. In the Henderson matter, respondent demonstrated improper judicial temperament and demeanor, failed to properly supervise his staff, and notarized affidavits in support of peace bond applications when the affiants did not appear before him, swear out an oath, or sign the affidavit in his presence. Finally, in both matters, respondent demonstrated a practice of charging fees for peace bonds that were in excess of those authorized by law and of double-charging fees, *i.e.*, charging both the peace bond plaintiff and defendant the same fees for the same services, in order to enrich himself. The Commission further found that respondent is an experienced attorney who knew or should have known better. For this misconduct, the Commission recommended that respondent be removed from office and be assessed with costs. The Commission also recommended that the right to bring lawyer discipline proceedings against respondent be reserved.

**DISCUSSION**

This court is vested with exclusive original jurisdiction in judicial disciplinary proceedings by La. Const. art. V, § 25(C), which provides, in pertinent part:

> On recommendation of the judiciary commission, the supreme court may censure, suspend with or without salary, remove from office, or retire involuntarily a judge for willful misconduct relating to his official duty, willful and persistent failure to perform his duty, persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute, conduct while in office which would constitute a felony, or conviction of a felony.

5

This court makes determinations of fact based on the evidence in the record and is not bound by, nor required to give any weight to, the findings and recommendations of the Judiciary Commission. *In re: Quirk*, 97-1143 pp. 3-4 (La. 12/12/97), 705 So.2d 172, 176.

In addition to the substantive grounds for disciplinary action listed in the Louisiana Constitution, this court, in accordance with its supervisory authority over all lower courts, has adopted the Code of Judicial Conduct. The Code of Judicial Conduct is binding on all judges, and violations of the Canons contained therein may serve as a basis for the disciplinary action provided for by La. Const. art. V, § 25(C). *In re: Quirk*, 97-1143 at 4, 705 So.2d at 176. On the other hand, however, it is not necessary that there be a violation of a Canon of the Code of Judicial Conduct for there to be constitutional misconduct under Article V, Section 25(C). "If there is misconduct as defined in the Constitution, it is irrelevant that no ... ethical canon has specifically been violated." *In re: Lemoine*, 96-2116 p. 2 (La. 4/4/97)(on rehearing), 692 So.2d 358, 359.

The standard of proof in judicial discipline cases is the clear and convincing standard. *In re Johnson*, 96-1866 p. 7 (La.11/25/96), 683 So.2d 1196, 1199*; In re Huckaby*, 95-0041 p. 6 (La. 5/22/95), 656 So.2d 292, 296. This standard requires the level of proof supporting the Commission's factual findings must be more than a mere preponderance of the evidence but less than beyond a reasonable doubt. *Id.*

Many of the allegations against respondent assert that his alleged failure to follow the law on peace bonds rose to the level of judicial misconduct. In *In re: Quirk*, 97-1143 (La. 12/12/97), 705 So.2d 172, we held that "a judge may be found to have violated La. Const. art. V, § 25 by a legal ruling or action made contrary to clear and determined law about which there is no confusion or question as to its

interpretation and where this legal error was egregious, made in bad faith, or made as a pattern of practice or legal error."

With those precepts in mind, we entertained oral argument in this matter pursuant to Supreme Court Rule XXIII, § 14. For the reasons set forth below, and to reign in the length of this opinion, we hereby adopt the findings of fact and conclusions of law made by the Commission, which, the record convinces us, properly applied the clear and convincing standard of proof as set forth in *Huckaby*, 95-0041, p. 6, 656 So.2d at 296. For the purposes of clarity, we will discuss in turn each count of the formal charge, and then conclude with our discussion of the appropriate sanction.

### *Count One – Peace Bond Amounts, Duration, and Refunds*

Count One is related to peace bonds issued by respondent against the defendants in the LeBlanc/Vignes matter and the Henderson matter. Count One alleged respondent's conduct violated Canons 1, 2A, 2B, 3(A)(1), 3(A)(7), and 3B(1) of the Code of Judicial Conduct and constituted "willful misconduct relating to your official duty," "willful and persistent failure to perform your duty," and "persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute" in violation of La. Const. art. V, § 25(C). The allegations consist of four categories: (a) instances where respondent failed to refund money paid to him for peace bonds, after the bonds had expired without forfeiture;[4] (b) instances where he failed to *timely* refund money paid to him for peace bonds, after the bonds had expired without forfeiture; (c) instances where he impermissibly extended the terms of peace bonds beyond the six-month maximum

---

[4] With regard to alleged instances where respondent failed to refund money paid to him for peace bonds, after the bonds had expired without forfeiture, both the Hearing Officer and the Commission found these allegations were not proven by clear and convincing evidence.

7

term allowed by law; and (d) instances where he required defendants to post peace bonds in excess of $1,000, the maximum allowed by law.

We find the Commission correctly concluded the evidence was clear and convincing that respondent failed to *timely* refund money paid to him for peace bonds, after the bonds had expired without forfeiture. Respondent issued various peace bond judgments against the defendants in the LeBlanc/Vignes matter and the Henderson matter. These bonds expired without forfeiture, and in accordance with La. Code Crim. P. art. 33, the peace bonds were automatically discharged at the end of thirty days from the expiration of the period specified therein. The record shows that in seven instances, respondent failed to timely refund the peace bond money to the defendants or their representatives at the end of that thirty-day period. The time ranged from a few days late to over two years late.[5]

Respondent does not seriously dispute that he failed to timely refund the peace bond money to the defendants or their representatives after the original bond expired. Instead, as he continues to maintain before this court, he stated that he

---

[5] Respondent failed to timely refund $1,000 to Antoinette Henderson for two $500 peace bonds. He was required to refund the money by November 19, 2011; it was not refunded until November 23, 2011.

Respondent failed to timely refund $500 to Marilyn Pickard for a $500 peace bond for Kacie O'Banion. He was required to refund the money by January 1, 2011; it was not refunded until March 30, 2011.

Respondent failed to timely refund a total of $3,000 to Jolene Albright for four separate peace bonds for members of the Vignes family. Ms. Albright made the payments because respondent extended the term of the bonds on January 20, 2011. As we discuss below, we disagree with respondent that such "extensions" were legally permissible; nevertheless, respondent failed to refund the money by the extended deadlines that ranged from January 25, 2012 to February 25, 2012. Respondent did not refund Ms. Albright's money until May 11, 2012.

Respondent failed to timely refund $2,000 to Kathleen Wright for two $1,000 peace bonds for members of the Vignes family. He was required to refund the money by March 9, 2011; it was not refunded until May 29, 2013, well after the OSC's investigation began, because his office lost track of the bond and did not realize the bond remained in his trust account. Respondent admitted that the delay of over two years in refunding Ms. Wright's money was excessive, although in brief to this court he denies this delay constituted a violation of his ethical duties, he conceded as much in his testimony before the Commission. Respondent also conceded Ms. Wright was entitled to an apology for his failure to timely refund her money.

failed to do so because the bond was carried over to a new peace bond judgment, his office lost track of the bond, or it was simply a mistake.

In his appearance before the Commission, respondent testified he has taken remedial measures to ensure that peace bond monies are timely refunded to those who post them when there has been no forfeiture of the peace bond. Respondent explained that subsequent to the events at issue, he now almost always waives the posting of a cash bond if he determines that a peace bond is necessary, and thus his court does not have to regularly refund peace bonds. Although he asserted most defendants abide by the conditions, respondent acknowledged this new procedure of issuing peace bonds without the posting of a cash bond does little to deter the peace bond defendant from violating it.

As the Commission found, the Louisiana Code of Criminal Procedure does not particularize when a defendant is due a refund after an automatic discharge of his bond. Because there is not "clear and determined law" on this issue, the Commission did not find respondent's failure to timely refund peace bond money was legal error rising to the level of judicial misconduct under the standard of *In re: Quirk*, *supra*. However, La. Code Crim P. art. 33 provides that "[a] peace bond is automatically discharged at the end of thirty days from the expiration of the period specified therein, unless a proceeding to declare a forfeiture has been brought within that time." Thus, under a common sense interpretation of La. Code Crim. P. art. 33, and because the discharge of the bond is "automatic," and does not require a request for refund by the defendant, we agree with the Commission that a judicial officer must make all reasonable efforts to refund the defendant's money within a reasonable period of time after expiration of the thirty-day period noted in Article 33. Accordingly, we agree with the Commission that the refund to Antoinette Henderson, which occurred four days after the thirty-day forfeiture

9

period, occurred within a close enough proximity of the forfeiture period, but that the refunds to Kathleen Wright (more than two years after the thirty-day forfeiture period), Jolene Albright (anywhere from two to two and a half months after the thirty-day forfeiture period), and Marilyn Pickard (approximately three months after the thirty-day forfeiture period) did not occur within a reasonable period of time.

We next turn to the allegations in Count One that respondent impermissibly extended the terms of peace bonds beyond the six-month maximum term allowed by law. We find the Commission correctly concluded such extensions are not permitted under the Code of Criminal Procedure. La. Code Crim. P. art. 30(A) provides that a "peace bond shall be for a specified period, not to exceed six months, …."

On June 4, 2010, respondent issued a peace bond judgment against Robert Vignes, Jr. Respondent extended the peace bond judgment against Mr. Vignes, Jr. on January 20, 2011, and again on July 25, 2011.

On July 1, 2010, respondent issued a peace bond judgment against Kacie O'Banion. Respondent extended the peace bond judgment against Ms. O'Banion on January 20, 2011, and again on June 25, 2011.

On August 6, 2010, respondent issued peace bond judgments against Eileen Vignes and Robert Vignes, Sr. Respondent extended the peace bond judgments against Mr. and Mrs. Vignes on January 20, 2011, and against on July 11, 2011.

Respondent does not seriously dispute that he extended the terms of these peace bonds. He argues here, as he did below, that he was merely responding to Jennifer LeBlanc and Carrol LeBlanc's "application to extend peace bond[s]" as against these defendants. Furthermore, he asserted it was his understanding of the law that peace bonds, as orders of protection, could be modified. Respondent

10

testified it was his intent for the previously posted bonds to be carried over to the new judgment of peace bond and no additional cash was required.

In his appearance before the Commission, respondent testified he no longer extends peace bonds beyond a term of six months unless he first has a hearing. Respondent testified he has changed this procedure because he determined that extending the terms of peace bonds without a hearing "was inappropriate or lacked … checks and measures to ensure that the parties had an opportunity to refute any additional facts in those cases."

We agree with the Commission that respondent's repeated extensions of the terms of peace bonds beyond the six-month maximum term allowed by law constituted a pattern of legal error. Respondent contends the extension or modification of peace bonds is permissible under La. Rev. Stat. 46:2136, relative to Protective Orders, and La. Code Crim. P. art. 31. La. Rev. Stat. 46:2136(F) provides in pertinent part that "any final protective order or approved consent agreement shall be for a fixed period of time, not to exceed eighteen months, and may be extended by the court, after a contradictory hearing, in its discretion." La. Code Crim. P. art. 31 provides as follows:

> If the defendant fails to give the peace bond required under Articles 29 and 30, he shall be committed to jail. The defendant may be discharged by the committing or some other magistrate upon giving bond as ordered. The committing magistrate may revoke or modify his order for a peace bond.

Respondent's reliance on these provisions for his authority is misguided. The extension provided for in La. Rev. Stat. 46:2136 applies only to protective orders and not peace bonds. Furthermore, Article 31 does not authorize extended peace bonds. La. Code Crim. P. art. 30 mandates that: "The peace bond shall be for a specified period, *not to exceed six months*, …." [Emphasis supplied.] Article 31 concerns a party who has been jailed for failing to post a bond, and its reference

to modification does not supersede the mandatory limitation in Article 30 on the duration of a peace bond. Furthermore, La. Code Crim P. art. 33 provides that "[a] peace bond is automatically discharged at the end of thirty days from the expiration of the period specified therein, unless a proceeding to declare a forfeiture has been brought within that time." Accordingly, we find no legal authority in the relevant articles for a justice of the peace to extend the duration of a peace bond past six months without conducting a hearing or affording the defendant his or her right to due process.

Thus, respondent impermissibly extended the terms of peace bonds against defendants in the Vignes case in no less than eight instances, and such repeated legal error is sufficient to constitute a pattern. Moreover, as the Commission reasoned, when considered in conjunction with the numerous other legal errors regarding peace bonds that were alleged and proven in Counts Two, Five, and Amended Count Four *infra*, it is clear respondent's legal errors with respect to improperly extending the terms of peace bonds have been part of a larger pattern and practice of legal error with respect to peace bonds in general.

Next, we agree with the Commission the record shows by clear and convincing evidence that respondent impermissibly required defendants to post peace bonds in excess of $1,000, the maximum allowed by law. La. Code Crim. P. art. 30(A) provides that the maximum amount of a peace bond fixed by a justice of the peace "shall not exceed one thousand dollars." Respondent required defendants Eileen Vignes and Robert Vignes, Sr. to post more than $1,000 each for peace bonds. This occurred when respondent kept money paid by Kathleen Wright (a total of $2,000) for bonds that were set to expire on February 6, 2011. On January 20, 2011, while still holding the $2,000, respondent demanded and received

additional peace bond payments from Mr. and Mrs. Vignes for the extended bonds he ordered that day.

Respondent does not seriously dispute that he exceeded the $1,000 maximum limit for peace bonds on one occasion, but describes his actions as inadvertent and unintentional. Respondent testified that it was his intent for the previously posted bonds to be carried over to the new judgment of peace bond and no additional cash was required. Furthermore, there was confusion caused by the inadvertent overlapping of two $1,000 bonds paid by Jolene Albright, a friend of the Vignes family. As a result, respondent's office lost track of the bond posted by Ms. Wright and did not realize the bond remained in his trust account. The Commission accepted respondent's assertions, but viewed his failures in this regard as stemming from incompetence and gross negligence in the oversight of his office, rather than a failure on his part to faithfully enforce the law. In his appearance before the Commission, respondent testified that in order to avoid losing track of peace bond monies in the future, he has "created [an] escrow account where all posted bonds and forfeited bonds are at all times to be able to keep track of those funds." We agree with the Commission that the record demonstrates respondent's incompetence and gross negligence in the oversight of his office.

We have previously found that a judge's professional ineptitude and gross negligence in the operation of her court violates the Louisiana Constitution and the Code of Judicial Conduct. *See In re: Hunter*, 02-1975 (La. 8/19/02), 823 So.2d 325. Canon 3B(1) provides that a "judge shall diligently discharge the judge's administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration, and should cooperate with other judges and court officials in the administration of court business." Furthermore, Article V, §

13

25(C) of the Louisiana Constitution provides that a judge may be disciplined for her "willful and persistent failure to perform [her] duty" and for "persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute."

*Legal Conclusions Relating to Count One*

Based on respondent's repeated legal error in impermissibly extending the terms of peace bonds, we agree with the Commission there is clear and convincing evidence respondent failed to personally observe a high standard of conduct so as to preserve the integrity and independence of the judiciary, in violation of Canon 1; failed to respect and comply with the law and to act in a manner that promotes public confidence in the integrity and impartiality of the judiciary, in violation of Canon 2A; failed to be faithful to the law and maintain professional competence in it, in violation of Canon 3A(1); and failed to dispose of judicial matters promptly, efficiently, and fairly, in violation of Canon 3A(7).

Based on respondent's failure to timely refund bond money and inadvertent holding of bond money in excess of that permitted by law, we agree the record demonstrates by clear and convincing evidence that respondent violated Canons 1, 2A, and 3A(7), and failed to diligently discharge his administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration, in violation of Canon 3B(1).

We find respondent's faulty interpretation of the law, failure to faithfully enforce it, incompetence and gross negligence in the administration of his office, and general indifference to these failures has negatively affected many lives and casts a dark shadow on the judiciary as a whole. Thus, we agree with the Commission the OSC has proven by a clear and convincing standard that respondent violated the Code of Judicial Conduct as set forth above, engaged in

14

willful misconduct relating to his official duty, engaged in willful and persistent failure to perform his duty, and engaged in persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute in violation of La. Const. art. V, § 25(C).[6]

---

[6] The OSC did not, however, prove that respondent's incompetence and gross negligence with respect to peace bonds was motivated by family, social, political, or other relationships. The Commission likewise found the OSC did not prove respondent lent the prestige of his judicial office to advance his private interests or the private interests of others. There was no evidence presented that respondent's relationships with the LeBlanc or Henderson/Volpe families influenced his actions against the Vignes family, Ms. O'Banion, or Mrs. Henderson. Therefore, we agree with the Commission that respondent did not violate Canon 2B.

In Count Two, the OSC alleged respondent charged excessive court costs and/or filing fees for the filing of applications for peace bonds, the filing of motions to extend the terms of previously issued peace bonds, and the posting of money for peace bonds. Respondent did not dispute the fees he charged, but claimed the fees were authorized to recover credit card costs, authorized by law, or properly refunded when appropriate. The OSC asserted, and the Commission found, that respondent could impose a maximum of $15 per peace bond application.

At issue, then, is whether there is a determined limit on the fees that a justice of the peace may charge. La. Code Crim. P. art. 29(B) provides that the peace bond applicant "shall pay as advanced court costs a fee of fifteen dollars for each defendant summoned to a hearing." If the peace bond is issued, the costs are paid by the defendant, but if the defendant is discharged and no peace bond is issued, the costs are paid by the applicant. La. Code Crim. P. art. 29(B). La. Rev. Stat. 13:2589(A) provides, in pertinent part: "Justices of the peace and constables shall receive no fees in criminal matters or in peace bond cases, but in lieu thereof they shall receive such salaries as are fixed by the parish governing authority and paid by the parish, ...."[7] In addition to arguing the fees he charged were authorized to recover credit card costs, were authorized by law, or were properly refunded when appropriate, respondent called witnesses, including his predecessor and another

---

[7] In 2010, 2011, and 2012, the Parish of Ascension paid respondent $1,300 per month gross income to perform his duties as a justice of the peace, including peace bond matters. Gwen LeBlanc, the Ascension Parish Chief Financial Officer/Treasurer, testified that, in addition to this salary the parish pays justices of the peace and constables a benefits package for medical insurance and retirement pension. The expense to Ascension Parish in 2010 for respondent's benefits was $1,580.55 per month; in 2011 and 2012 it was $1,606.19 per month.

In addition to his income from Ascension Parish, respondent, like other justices of the peace, takes in self-generated fees from a variety of sources including weddings. According to respondent's Personal Financial Disclosure Statements, he collected the following amounts in self-generated fees: $0 in 2009, $3,771.46 in 2010, and $15,360 in 2011.

justice of the peace, who testified that it had been the practice for justices of the peace to charge more than $15 for peace bonds. However, we believe the law is clear that costs are capped at $15. In fact, even if it had been the custom and practice for justices of the peace to charge more than $15,[8] the justices of the peace training manual now explicitly states that no more than $15 can be charged for the peace bond. In addition, respondent, in 2012, also stopped his practice of charging more than $15 in fees.

The record demonstrates respondent charged in excess of the $15 limit for peace bonds. Respondent charged Helen Henderson Volpe, Marvin Reid Henderson, Jr., and Antoinette Henderson $270 in costs for two bonds, when the most he was allowed to charge by law was $15 for each bond or $30. Respondent charged Carrol LeBlanc, Jennifer LeBlanc, Marilyn Pickard, and Jolene Albright a total of $720 in costs for four bonds, when the most he was allowed to charge by law was $15 for each bond or $60. Respondent and his secretary claimed the complaining party receives a refund of the filing fee when peace bonds are refunded and costs are withheld from the defendant. However, though he was allowed additional time to produce records as he had done for other refunds, respondent failed to produce any documentation showing Ms. Volpe, Mr. Henderson, or Mr. LeBlanc received their refunds.

<em>Legal Conclusions Relating to Count Two</em>

We find respondent, in charging fees not authorized by law, has committed legal error contrary to a clear and determined law in accordance with *Quirk*. While his conduct may not have been borne of bad faith or especially egregious given his

---

[8] Although custom may show that respondent did not act in bad faith and may serve as a mitigating factor to his behavior, it cannot be used to excuse a failure to be informed in the law, especially for a lawyer. *See In re: Elloie*, 05-1499 (La. 1/19/06), 921 So. 2d 882; *In re: Johnson*, 08-2397 (La. 1/21/09), 1 So. 3d 425; *In re: Aucoin*, 99-3084 (La. 8/31/00), 767 So. 2d 30.

reliance on his predecessor and at least one other justice of the peace, the Commission found that, when combined with respondent's double charging fees (*i.e.*, charging both the plaintiff and the defendant the same fees for the same services), the legal error was a part of a pattern or practice of error. We agree with the Commission's reasoning, and conclude respondent failed to maintain professional competence in the law in accordance with Canon 3A(1), which is only made worse by the fact that he is a lawyer. He also failed to discharge his administrative responsibilities diligently in a competent manner in violation of Canon 3B(1). He instead blamed his assistant.

Thus, we agree with the Commission that respondent violated Canons 1, 2A, 2B, 3A(1), and 3B(1) of the Code of Judicial Conduct, engaged in willful misconduct relating to his official duty, and persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute in violation of La. Const. art. V, § 25(C) as charged.

As the Commission found, there is substantial evidence respondent used these fees to enrich himself in a "desire to advance [his] own personal interests" as charged in the Formal Charge. First, respondent increased the fees charged by his predecessors by effectively double-charging peace bond fees. Second, there is no evidence respondent refunded the fees (as required by law) to the applicant even when a forfeiture proceeding was initiated and ultimately successful. Third, as the Commission noted, there can be no coincidence that respondent's self-generated funds increased from $0 in 2009 to $15,360 in 2011. *See* note 7, *supra*. Those fees were, in part, generated from respondent's overcharging and double-charging. Respondent testified that all fees generated from peace bonds were deposited into his operating account and were used to pay for office expenses. While that may be true, the Commission noted, it is also true that by further subsidizing his office

18

through these excessive fees, he was able to personally gain by not using other self-generated fees for office expenses (such as fees for performing weddings, etc.). The best evidence of his personal gain is the exponential increase in his self-generated revenues as found in his Personal Financial Disclosure Reports.

*Count Three*

The Hearing Officer and the Commission determined the allegations in Count Three were not proven by clear and convincing evidence. We find no error in that determination.

*Count Four (As Amended) – Jail Terms, Warrants*
*& Orders Impacting Custody*

Count Four alleged respondent imposed impermissibly excessive jail terms on peace bond defendants Kacie O'Banion and Eileen Vignes; abused his authority to issue bench and arrest warrants; impermissibly issued orders impacting the custody and visitation rights of a parent and others when he knew there was a proceeding already pending in district court with jurisdiction over these issues; and issued arrest warrants and judgments of peace bonds in areas where he had no subject matter jurisdiction, against non-residents of Ascension Parish, for conduct that was threatened to occur outside of Ascension Parish, without probable cause, and caused them to be jailed for more than five days.

The record shows that on June 10, 2010, respondent rendered a peace bond judgment against Kacie O'Banion and ordered her to appear in his court on July 1, 2010 to post a $100 bond. On July 1, 2010, Ms. O'Banion went to court with $60 instead of $100 because, she alleged, respondent told her that $50 would suffice. Mrs. Eileen Vignes offered to pay the difference, but respondent allegedly refused to allow Mrs. Vignes to walk to her bank and retrieve the necessary funds. When Ms. O'Banion could not post bond, respondent rendered another peace bond judgment against Ms. O'Banion for six months and ordered her to post a $500

bond. Because Ms. O'Banion was unable to immediately pay $500 for the increased bond judgment, respondent issued an order holding her in contempt, issued a bench warrant for her arrest, and had her immediately taken into custody for failing to post the bond money. Respondent sentenced Ms. O'Banion to five days incarceration, but in his order, he directed the Ascension Parish Sheriff to bring her back to court on July 7, 2010, which would be a total of six days.[9] On July 7, 2010, Ms. Marilyn Pickard paid respondent $500 for Ms. O'Banion's peace bond and respondent issued an order for her release. Ms. O'Banion testified that she was not given her anxiety medication during her incarceration and as a result had to be hospitalized after having suffered a "nervous breakdown."

On July 1, 2010, Mrs. Eileen Vignes accompanied Kacie O'Banion to respondent's court as a witness to a property dispute between Ms. O'Banion and the LeBlancs. During the hearing, respondent found that Mrs. Vignes had violated the peace bond issued on May 26, 2010, signed a Forfeiture of Bond, and ordered the $500 posted on June 21, 2010 forfeited. Respondent also issued an arrest warrant for Eileen Vignes for violating La. Rev. Stat. 14:79, Violation of a Protective Order, during a child custody exchange at the police substation on June 22, 2010; issued a new Judgment of Peace Bond against Mrs. Vignes and ordered her to post a $1,000 bond; issued an order holding Mrs. Vignes in contempt because she could not immediately pay the $1,000; issued a bench warrant for her

---

[9] Despite the fact that he had ordered Ms. O'Banion to serve five days in jail, respondent ordered the Ascension Parish Sheriff to "transport the defendant" to his office on July 7, 2010 at 3:00 p.m. Respondent argued that the order "did not say to hold her," and that it was up to the Sheriff to release Ms. O'Banion after the fifth day. The Hearing Officer flatly rejected respondent's argument, calling it "ridiculous." For its part, the Commission pointed out that "there would be no way for the Sheriff's Department to transport Ms. O'Banion on July 7th if she was no longer in their custody. Thus, the direct effect of JP Laiche's Order was that Ms. O'Banion was held in jail for over [five] days." See La. Code Crim. P. art. 31 (five days maximum sentence for failure to give peace bond ordered by a justice of the peace). We agree that respondent's order violates the statute on its face.

arrest for contempt; sentenced her to serve five days in the Ascension Parish Prison; and ordered the Ascension Parish Sheriff's Office to transport her back to his court six days later, on July 7, 2010, to post her bond. On July 7, 2010 and pursuant to the order of July 1, 2010, Mrs. Vignes was transported back to respondent's court. Respondent again issued a bench warrant and ordered Mrs. Vignes to serve an additional five days for failure to post her peace bond. On July 13, 2010, and pursuant to respondent's order of July 7, 2010, Mrs. Vignes was transported back to respondent's court. Once again, Mrs. Vignes was ordered to serve an additional five days for failure to post her peace bond – this time by Justice of the Peace John Hebert who filled in for respondent. On July 14, 2010, Kathleen Wright, Mrs. Vignes's sister, posted the peace bond. The Commission adopted the Hearing Officer's finding that respondent was directly responsible for Mrs. Vignes's lengthy incarceration.

The record further demonstrates that respondent abused his authority by issuing peace bond orders that impacted the custody and visitation rights of a parent and others. Although the Vignes and LeBlanc families were embroiled in a custody battle in East Baton Rouge Parish Family Court before Judge Annette Lassalle, respondent nevertheless issued Peace Bond Orders and Judgments against Mr. and Mrs. Vignes, Robert Vignes, Jr., and Kacie O'Banion that prohibited the defendants from going near the plaintiffs and the minor child and from attending any exchanges of the minor child at a Sheriff's substation, all "until further Orders of this Court and/or the 19th Judicial District Court."[10]

---

[10] The Orders of Peace Bond refer to the 19th JDC, but the custody proceedings were pending in the East Baton Rouge Parish Family Court. In any event, during his appearance before the Commission, respondent attempted to justify his issuance of orders that prohibited the Vigneses and Ms. O'Banion from going near the minor child and/or attending exchanges of the minor child by testifying that he has never "been provided with a custody judgment or anything involving the proceedings in East Baton Rouge Parish. And the action that was taken at that particular time when the Court issued the temporary injunctions ordering the peace [bonds] put provisions in there that if in the event that there are judgments of East Baton Rouge Parish, those

*Legal Conclusions Relating to Amended Count Four*

We agree with the Commission that the sentences respondent imposed upon Ms. O'Banion (six days) and Mrs. Vignes (thirteen days) were a clear violation of La. Code Crim. P. art. 31, which states that a defendant who has been committed for failure to give a peace bond ordered by a justice of the peace may not be held longer than five days. This was legal error on the part of respondent contrary to a clear and determined law in accordance with *Quirk*. Furthermore, we find respondent's legal error was egregious and made in bad faith. Respondent's interpretation of the law is not supported by the express terms of the Code of Criminal Procedure; consequently, the sentences were illegal. Ms. O'Banion suffered severe mental problems as a result of her incarceration. She was afraid to go back in front of respondent. We agree with the Commission that, when considered with respondent's previous history with the Vignes family, this conduct shows that at some point respondent's actions against the Vignes family became motivated not from justice for Jennifer and Carrol LeBlanc, but from bias against the Vignes family and their associates. Thus, in addition to being made in bad faith, the legal errors were egregious because both Ms. O'Banion and Mrs. Vignes were deprived of their freedom for an extensive period of time.

We also find respondent exceeded his jurisdiction by interfering with a custody and visitation case pending before Judge Lassalle of the East Baton Rouge Parish Family Court. The family court had exclusive jurisdiction over the custody and visitation issues pertaining to the minor child of Jennifer LeBlanc and Robert Vignes, Jr. Respondent issued various peace bond orders and judgments against Mr. and Mrs. Vignes, Kacie O'Banion, and Robert Vignes, Jr. The orders and

would supersede the orders of this Court." The Commission did not find this argument persuasive, nor do we, especially given that respondent is an experienced attorney who handles mostly family and domestic cases in his private practice.

22

judgments contained a condition that accomplished one of two things: prohibited the defendants from going near the minor child or prohibited the defendants from attending an exchange of the minor child at a sheriff's substation.

To the extent that respondent issued orders and judgments that prohibited the defendants from going near the minor child, we find them to be in clear conflict with the jurisdiction of the district court and, thus, are legally erroneous. Respondent did not have the legal authority to prohibit members of the Vignes family (and perhaps even Ms. O'Banion) from going near the minor child. By doing so, respondent violated La. Code Civ. P. art. 4913(B), which provides that a justice of the peace court "has no jurisdiction in ... [a] claim for annulment of marriage, separation from bed and board, divorce, separation of property, or alimony." We find that respondent's repeated violations of his limited authority constitutes a pattern or practice of legal error and thus is amounts to error under the *Quirk* standard.

We agree with the Commission that, to the extent respondent issued orders and judgments prohibiting the defendants from attending the exchange at the Sheriff's substation, these orders were also legally erroneous. Because changes in custody cannot be effected without an exchange, the exchange is logically part and parcel of the family court judge's jurisdiction. As pointed out during the hearing, if neither Mr. Vignes nor any of his family members could pick up the child, then respondent was effectively interfering with Mr. Vignes's custody over his child. In any event, we find no justification for respondent's entry into this matter at all – whether it dealt with the custody or the exchange of the minor child. This is especially true since the Kleinpeter Substation where the exchanges were to take place is located outside of respondent's jurisdiction in East Baton Rouge Parish.

Accordingly, his pattern of legal error violates the Constitution under the standard articulated in *Quirk* given the number of violations evident in the record.

We agree with the Commission that, through his conduct, respondent violated Canons 1, 2A, 3A(1), and 3A(4) of the Code of Judicial Conduct and has engaged in willful misconduct relating to his official duty in violation of La. Const. art. V, § 25(C), and engaged in persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute in violation of La. Const. art. V, § 25(C).

*Count Five – Extending Peace Bonds Without a Hearing;*
*Notarizing Peace Bond Applications*

In Count Five, the OSC alleged respondent impermissibly rendered judgments of peace bonds against defendants without holding a hearing or giving the defendants a meaningful opportunity to be heard; improperly notarized affidavits when the affiants did not appear before him, swear out an oath, or sign the affidavit in his presence and then improperly issued peace bond orders and set peace bond hearings based on improperly notarized affidavits; and failed to give proper notice of forfeiture of peace bond money to the defendant's surety.

We find the record demonstrates by clear and convincing evidence that respondent issued peace bond judgments without a hearing or giving the defendants a meaningful opportunity to be heard on five occasions. There can be no doubt that his actions constituted legal error, as both La. Code Crim. P. arts. 28 and 29(A) make it clear that a peace bond always requires a hearing "to determine the validity of the complaint."

On August 6, 2010, respondent rendered new peace bond judgments against Eileen Vignes and Robert Vignes, Sr. without a hearing. The defendants were served with the judgments while incarcerated and were not given the opportunity to testify in their defense. Respondent testified the new judgments were in

response to a forfeiture rendered against Mr. and Mrs. Vignes and they replaced the forfeited bond.

On January 20, 2011, respondent issued peace bond judgments against Eileen Vignes, Robert Vignes, Sr., Ms. O'Banion and Robert Vignes, Jr. without a hearing. On June 25, 2011, respondent rendered a peace bond judgment against Ms. O'Banion without a hearing. On July 11, 2011, respondent issued peace bond judgments against Eileen Vignes and Robert Vignes, Sr. without a hearing. On July 25, 2011, respondent issued a peace bond judgment against Robert Vignes, Jr. without a hearing. None of the defendants was given the opportunity to be heard. In each instance, respondent testified that it was not his intent to require a new bond for the defendants; rather, respondent maintained that he was merely modifying the original bond based upon his interpretation of La. Code Crim. P. art. 31 (a magistrate may "revoke or modify his order for peace bond"), and the previous bond would be "carried over to the new judgment."

As we explained above, the Commission is correct that neither the plain language of Article 31, nor the Official Revision Comments thereto, allow a magistrate to modify a peace bond to create what is essentially a new peace bond.[11] We agree with the Commission's reasoning that such an expansive reading of Article 31 would, in fact, create an absurdity, in that it would allow a magistrate to extend the terms of the peace bond indefinitely and, thus, render meaningless the six-month maximum term specified in La. Code Crim. P. art. 30. Therefore, we find respondent committed legal error when he failed to hold a hearing prior to entering into new peace bond judgments as specified in the five instances at issue.

---

[11] Respondent focuses on language in the Comment to the effect that "[a]dditional flexibility is provided by the new provision that the committing magistrate may revoke or modify his order for a peace bond." La. Code Crim. P. art. 31, Comment (b), Official Revision Comments – 1966. However, as we explained above, Article 31 clearly applies only to the failure of a defendant to give a peace bond, and allows the committing magistrate to revoke or modify the peace bond when the defendant has failed to furnish the bond. It does not allow the justice of the peace to extend the duration of the bond without a hearing.

We agree with the Commission's finding that respondent's legal error was egregious, made in bad faith, and made as part of a pattern or practice of legal error under *Quirk*. In particular, respondent's error was egregious because it violated the constitutional rights of the parties to present a defense. There is no greater expectation of our citizens then to expect that judges will protect their constitutional rights before subjecting them to the loss of liberty. Further, the overwhelming evidence is that respondent's error was not borne of ignorance. Respondent had minimal duties, yet collected fees that benefitted his office. We also find it implausible that any reasonable justice of the peace, let alone an attorney, would truly believe that he could forgo conducting a hearing on the basis that he was merely extending or modifying a peace bond, yet then could also simultaneously collect fees as if he were imposing a new peace bond.[12]

We next turn to the allegation that respondent issued two peace bond orders based on improperly notarized affidavits by Helen Volpe and Reid Henderson. In both cases, the affiants did not appear before him, swear out an oath, or sign the affidavit in his presence. There is no doubt such affidavits must be notarized. La. Code Crim. P. art 27 provides that a peace bond applicant "shall file **an affidavit** charging that the defendant has threatened or is about to commit a specified breach of the peace. The magistrate with whom the application is filed may examine under oath the complainant and any witnesses produced." [Emphasis added.]

On March 17, 2011, Helen Volpe filled out a Peace Bond Offense Report against Antoinette Henderson. The report requests the applicant provide contact information, information on the defendant, and a detailed statement. The form states: "The statement you are making is an Affidavit; which means this is a sworn

---

[12] The Commission agreed with the Hearing Officer's assessment that respondent's argument in this regard reflects "creative legal reasoning" in an attempt "to have it both ways."

statement under oath and in the presence of a Judge in a Court of Law." Ms. Volpe signed the form on March 17, 2011. Respondent's signature appears immediately after the words: "Sworn and subscribed before me on this 25 day of March, 2011." Respondent issued a peace bond order against Mrs. Henderson based upon this report.

Marvin Reid Henderson, Jr. also filled out a Peace Bond Offense Report against Mrs. Henderson. Mr. Henderson did not date the report but it was "Sworn and subscribed before" respondent on March 25, 2011. In his sworn statement, respondent admitted the report was not signed in his presence. Respondent issued a peace bond order against Mrs. Henderson based upon this report.

Respondent denied any misconduct in connection with his notarization of the peace bond applications.[13] The Commission rejected his argument, finding his failure to properly notarize the applications to be clear legal error. We agree with the Commission's determination. Additionally, under the *Quirk* standard, respondent's legal error was made in bad faith, because, as the Hearing Officer and the Commissioner found, respondent's misconduct was motivated by his desire to shortchange the work associated with properly notarizing Peace Bond Offense Reports. Respondent personally benefitted from these shortcuts, because he received his justice of the peace salary and yet did not perform the requisite work. By not doing the work he was elected to do, respondent was able to devote more time to his personal endeavors including his law practice.

Through his conduct, we agree with the Commission respondent has violated Canons 1, 2A, and 3A(1) of the Code of Judicial Conduct and has engaged in

---

[13] Respondent did not deny that he signed the reports at a different time than the applicants. As to the purpose of his signature on the form, he argued that he was not notarizing the signature of the applicant. Instead, he contended that by signing the report he was simply "denoting acceptance of the application to set the matter for hearing." As the Commission found, there is simply no legal support for this argument.

willful misconduct relating to his official duty in violation of La. Const. art. V, § 25(C), and engaged in persistent and public conduct prejudicial to the administration of justice that brings the judicial office into disrepute in violation of La. Const. art. V, § 25(C). Furthermore, we conclude respondent's actions were motivated by his desire to advance his personal interest in violation of Canon 2B.

Respondent ultimately acknowledged that he committed ethical misconduct by issuing peace bonds without a hearing and by improperly notarizing affidavits in support of peace bond applications, and admitted that his legal errors were egregious. In his brief to the Commission, as he does in this court, respondent claims he has corrected his notarial practices and "insures that all applications for peace bonds are now signed in his presence and properly notarized."

*Count Six – Temperament and Demeanor*

In Count Six, the OSC alleged respondent was impatient, undignified, and discourteous toward Antoinette Henderson, Gina Guidry, and Kathleen Wright, and allowed his staff to be impatient, undignified, and discourteous to persons contacting his office with valid concerns about the timing of refunds of money paid for peace bonds after the bonds expired.

According to the record, Mrs. Henderson appeared before respondent for a peace bond hearing on April 19, 2011, approximately one month after the tragic and unfortunate death of her husband. Ms. Guidry, Mrs. Henderson's daughter, attended the hearing as a witness and recorded her observations in her complaint to the OSC. According to these witnesses, respondent rudely and sarcastically commented that Mrs. Henderson was "scared" to attend the hearing without her witnesses. Respondent allowed only Ms. Guidry to attend the hearing; Mrs. Henderson's other witnesses were not heard. During the hearing, respondent made rude and inappropriate remarks to Mrs. Henderson, including the following:

28

Your husband must be rolling over in his grave right now.

You need more than psychological help. I wish I could do more to you. You don't seem like you would do very well in jail. I just arrested someone earlier today for violating a peace bond.

What do you own? Where do you work? How do you pay your bills? Who's going to take care of you?

Respondent denied making the rude remarks to Mrs. Henderson, and claimed he was asking about her financial status simply as a mechanism of assessing her ability to pay a peace bond. During his appearance before the Commission, respondent continued to maintain that he acted appropriately toward Mrs. Henderson. Nevertheless, respondent stated he was "prepared to issue a written apology to Ms. Henderson since she felt that she was intimidated and I was unprofessional and that I may have been offensive."

Count Six also alleged respondent was disrespectful and overly intrusive toward Ms. Guidry. During the April 19, 2011 hearing, he ordered Mrs. Henderson to turn over a copy of Ms. Guidry's Facebook page, despite having no jurisdiction over Ms. Guidry. Furthermore, there was no allegation in the Peace Bond Offense Reports that Ms. Guidry had posted anything on Facebook related to threats to her step-siblings. The Commission found respondent's order to Mrs. Henderson for Ms. Guidry's Facebook account was an example of extreme judicial overreach on his part and demonstrated bias against Mrs. Henderson and Ms. Guidry. Accepting the credibility determinations of the Hearing Officer and the Commission, which heard respondent testify in person, we find the record supports such a finding by clear and convincing evidence. [14]

---

[14] The Hearing Officer found that both Gina Guidry and Antoinette Henderson were credible witnesses, and that their testimony relative to their treatment at the hearing as well as their treatment by respondent's staff was "accurate and complete."

The Commission further found respondent allowed his staff to be impatient, undignified, and discourteous to persons contacting his office about refunds of money paid. At the end of Mrs. Henderson's peace bond term, Mrs. Henderson and Ms. Guidry made repeated phone calls to respondent's office regarding the refund of Mrs. Henderson's $1,000 in peace bond money. Their telephone calls were not returned. In addition, prior to receiving the refund, Mrs. Henderson went to respondent's office but was not allowed to see him. Respondent's staff told Mrs. Henderson that respondent only sees people with an appointment. When she stated that she would sit and wait, she was told she could not wait. A member of respondent's staff admitted she received messages from Mrs. Henderson about her refund but never called Mrs. Henderson back. She also admitted she was in the office the day Mrs. Henderson visited, but did not speak with her. Another staff member said she may have told Mrs. Henderson respondent was not available that day.

According to the record, in July and August 2010, Kathleen Wright paid respondent a total of $4,060 for peace bonds for members of the Vignes family. Respondent failed to provide Ms. Wright with any written accounting, failed to provide her with certified notice of forfeiture, failed to return her telephone call of December 7, 2010, and failed to respond to her letter of April 5, 2011. It was only after Ms. Wright filed a complaint with the Commission that she received a phone call from respondent. According to Ms. Wright, respondent scolded and intimidated her for complaining about him to the Commission and made disparaging remarks about Ms. Wright's sister, referring to what he perceived as

30

her mental problems. Ms. Wright felt intimidated by respondent's phone call and believed it was "out of line, if not illegal."[15]

The record supports the Commission's finding that respondent was rude, discourteous, and undignified with Mrs. Henderson, Ms. Guidry, and Ms. Wright in violation of the Code of Judicial Conduct including Canons 1, 2A, and 3A(3). Further, we agree with the Commission that respondent violated Canon 3B(2) when he allowed his staff to be impatient, undignified, and rude to Mrs. Henderson and Ms. Guidry. Respondent engaged in willful misconduct relating to his official duty, and engaged in persistent and public conduct prejudicial to the administration of justice that brought the judicial office into disrepute in violation of La. Const. art. V, § 25(C).

### *Additional Findings and Conclusions*

The Commission made additional findings and conclusions we find are supported by the record. Having had the opportunity to question respondent and observe his demeanor during his appearance before the Commission, the Commission wholly agreed with and adopted the Hearing Officer's parting conclusions regarding respondent and his conduct:

> In addition to the troubling findings contained in this Hearing Officer Report, the Hearing Officer is compelled to note the indifference and lack of personal responsibility exhibited by JP Laiche during the hearing. His actions caused additional suffering to a widow and her daughter who were grieving the recent loss of a husband and step-father. His actions also contributed to the mental disturbance and breakdown of Kacie O'Banion in the Ascension Parish Prison over a long holiday weekend. His actions interfered in a custody case pending in another parish. His failure to keep accurate accounting records on the peace bond fees and

---

[15] Ms. Wright testified via deposition, and thus did not appear before the Hearing Officer; nevertheless, the Hearing Officer found her account to be credible, citing the fact that Ms. Wright had "no axe to grind" because she is (or was, as of January 2013) estranged from her sister and the Vignes family.

refunds and "losing track" of $2,000 sitting in an IOLTA account unaccounted for is most disturbing. His lack of empathy, concern, and rather flippant attitude about these events, in particular, struck the hearing officer as troublesome.

Finally, in nearly every allegation (which are quite numerous as gauged by the lengthy Formal Charge), JP Laiche casts blame on everyone from his own sister and assistant, to the Attorney General, the Legislature, and the Ascension Parish Sheriff's Office instead of himself. There was a notable lack of any personal responsibility for any of these events. In matters of law, JP Laiche's faulty legal conclusions align with his conduct - as if they were constructed after the fact to justify his behavior. His testimony was likewise self-serving and contained a notable lack of appreciation of the consequences of his actions. It appears that he persistently abused his power and he should be held accountable for his actions.

### *Imposition of Discipline*

Having found that respondent's conduct violated the Code of Judicial Conduct and Louisiana Constitution Art. V, § 25(C), we find discipline is warranted against respondent. The Commission recommended respondent be removed from office. We agree with the Commission's recommendation. As did the Commission, we turn to the factors set forth by this court in *In re: Chaisson*, 549 So. 2d 259 (La. 1989).[16]

---

[16] In *Chaisson*, this court, citing *Matter of Deming*, 108 Wash.2d 82, 736 P.2d 639, 659 (1987), set forth a non-exclusive list of factors a court may consider in imposing discipline on a judge:

> (a) whether the misconduct is an isolated instance or evidenced a pattern of conduct; (b) the nature, extent and frequency of occurrence of the acts of misconduct; (c) whether the misconduct occurred in or out of the courtroom; (d) whether the misconduct occurred in the judge's official capacity or in his private life; (e) whether the judge has acknowledged or recognized that the acts occurred; (f) whether the judge has evidenced an effort to change or modify his conduct; (g) the length of service on the bench; (h) whether there have been prior complaints about this judge; (i) the effect the misconduct has upon the integrity of and respect for the judiciary; and (j) the extent to which the judge exploited his position to satisfy his personal desires.

We find respondent's conduct was serious, not isolated, and evidenced a pattern of misconduct. This case arose from four separate complaints against respondent by four different citizens regarding his handling of two separate peace bond matters. In these matters, we agree with the Commission that respondent repeatedly abused and exceeded his authority, improperly used his office to advance his own personal interests (by overcharging and double-charging peace bond litigants), demonstrated bias and prejudice, exhibited incompetence and gross negligence in the oversight of his office, and exhibited inappropriate judicial temperament and demeanor. In the Vignes matter especially, respondent, over the course of several years, persistently exceeded his authority by repeatedly and impermissibly extending the terms of peace bonds without conducting hearings, repeatedly and impermissibly issued peace bond orders and judgments that interfered with an ongoing custody case in another parish, and imposed illegal jail sentences on two individuals. Moreover, in several instances, respondent failed to timely refund peace bond monies after peace bonds expired without a forfeiture, including failing to refund $2,000 to Ms. Wright for over two years.

There can be no doubt that respondent's misconduct occurred in his justice of the peace court while he was acting in his official capacity.

Respondent acknowledged after the hearing before the Hearing Officer that he had made certain mistakes related to his failure to refund Ms. Wright her $2,000 for over two years, his failure to conduct hearings prior to extending the terms of peace bonds, and his improper notarization of affidavits, and that has since taken actions to avoid such mistakes in the future. Nonetheless, we agree with the Commission that respondent continues to be in a state of denial as to much of his misconduct and the seriousness of his actions. Based on the evidence adduced at the hearing before the Hearing Officer and respondent's appearance before the

33

Commission, which had the opportunity to question respondent and observe his demeanor during his appearance before the Commission, the Commission agreed with and adopted the Hearing Officer's findings that respondent repeatedly attempted to cast blame on others rather than accept personal responsibility for the events at issue and that he demonstrated a troubling lack of appreciation for the consequences of his actions. We find the record supports the Commission's assessment. Respondent in his brief to this court continues to refuse to accept responsibility for his actions.

Respondent claims he had limited experience as a justice of the peace when these actions occurred, but that claim is belied by his extensive experience as an attorney. Respondent assumed the office of Justice of the Peace, Second Justice Court, Parish of Ascension in October 2009. In May 2010, when he began issuing peace bond orders and judgments in the Vignes dispute, respondent was relatively new and had been a justice of the peace for approximately seven months. However, respondent's misconduct in this matter continued into 2010, 2011, 2012, and 2013, when he finally refunded the peace bond money owed to Ms. Wright. Moreover, unlike many justices of the peace, respondent has been a licensed attorney since 1989, and he had extensive experience handling domestic and family matters.

Respondent has incurred previous discipline as a justice of the peace. In May 2013, respondent was cautioned by the Commission for violating Canons 1, 2A, and 3A(1) of the Code of Judicial Conduct by taking judicial action in a case after another justice of the peace was appointed to hear it.

There can be no dispute that respondent's actions have harmed the integrity of and respect for the judiciary. Several citizens felt they were victimized (and the Hearing Officer and the Commission concluded they were in fact victimized) by

34

respondent's outrageous misconduct. Gina Guidry, a firefighter in East Baton Rouge Parish, believed she and her mother were mistreated by respondent. As stated by the Hearing Officer, "[a]s a public servant, [Ms. Guidry] understood and recognized the treatment she and her mother received from Respondent was at best, undignified, and at worst, insulting." Respondent imposed unlawful jail sentences upon Mrs. Vignes and Ms. O'Banion, which contributed to the mental breakdown of Ms. O'Banion, who was jailed in the Ascension Parish Prison over a long holiday weekend. He impermissibly issued orders interfering with Mr. Vignes's ability to exercise visitation and custody rights with his son. He delayed in refunding peace bond monies to several individuals, including failing to return to Ms. Wright the $2,000 owed to her for more than two years, refused to answer her questions about her refund, and then scolded and intimidated her for complaining about him to the Commission. He violated the Vigneses' and Ms. O'Banion's fundamental due process rights by impermissibly extending the terms of peace bonds without a hearing. He overcharged and double-charged peace bond litigants for the same fees, thereby enriching himself at their expense. We agree with the Commission's conclusion that there can be no doubt respondent's widespread misconduct has caused harm to the integrity of and respect for the judiciary.

Additionally, the evidence demonstrated respondent exploited his judicial office for his own financial gain. He charged fees for peace bond matters in excess of that authorized by law and double-charged fees to both peace bond plaintiffs and defendants. In addition, the Commission and the Hearing Officer found that respondent's failure to conduct hearings before extending the terms of peace bonds and failure to properly notarize affidavits were committed in bad faith because such actions allowed him to collect fees and a salary without having to perform the

35

requisite work. These actions were taken in order to enrich himself and to advance his own private interests, as evidenced by the noted increase in his self-generated revenues from 2009 to 2011.

Finally, we note that, before recommending removal from office, the Commission stated:

> The Commissioners considered a recommendation of removal to be warranted to protect the citizens who might come before Respondent's court in the future and to protect and preserve the integrity and impartiality of the judiciary. The Commission found that Respondent exhibited a pervasive disregard for the law, oftentimes to advance his own self-interests, as well as gross incompetence in the oversight of his office and an intemperate judicial demeanor that had serious emotional, physical, and financial consequences for several citizens who came before him. Unlike many justices of the peace, Respondent had experience and training as a lawyer, which exacerbated the seriousness of his misconduct, in the Commission's view. Moreover, Respondent did not appear to be particularly troubled that his actions inflicted serious harm on those he was entrusted with serving, and thus the Commission has grave concerns about his treatment of those who would come before him in the future and its effect on their perception of the judiciary. Given the magnitude of the misconduct, and given Respondent's demonstrated indifference, lack of personal responsibility, and lack of appreciation for the consequences of his actions, the Commission ultimately concluded that there was no middle ground for redressing Respondent's serious and persistent misconduct.

**CONCLUSION**

Upon review of the record, we adopt the Commission's rationale, and conclude the most severe sanction of removal from office is warranted in this case to protect the integrity of the judiciary and the public from future harm. Respondent's misconduct as set forth above is so prejudicial to the administration of justice in his justice of the peace court that he cannot be allowed to remain on the bench. In our view, any discipline less than removal would undermine the

judicial discipline process and diminish the integrity of the judiciary. We further order respondent to reimburse and pay to the Commission $14,243.80 in hard costs. At the Commission's suggestion, we also reserve the right of the Louisiana Attorney Disciplinary Board to bring lawyer discipline proceedings against respondent for any violations of the Rules of Professional Conduct relating to his use and maintenance of his attorney trust account.

**DECREE**

Accordingly, for the reasons stated herein, it is ordered, adjudged, and decreed that respondent, Justice of the Peace Leroy J. Laiche, Jr., Second Justice of the Peace Court, Parish of Ascension, State of Louisiana, be, and is hereby, removed from office, and that his office be, and is hereby, declared to be vacant. Further, the respondent is ordered pursuant to La. Sup.Ct. Rule XXIII, § 26 to refrain from qualifying as a candidate for judicial office for five years and until certified by this court as eligible to become a candidate for judicial office. Finally, we cast the respondent with $14,243.80 in costs incurred in the investigation and prosecution of his case.

**REMOVAL FROM JUDICIAL OFFICE ORDERED.**

03/15/16

# SUPREME COURT OF LOUISIANA

## NO. 2015-O-1691

## IN RE: JUSTICE OF THE PEACE LEROY J. LAICHE, JR., SECOND JUSTICE COURT, PARISH OF ASCENSION, STATE OF LOUISIANA

*JUDICIARY COMMISSION OF LOUISIANA*

**WEIMER, J.**, dissenting.

I respectfully dissent.

Although in no way condoning what this Justice of the Peace has admitted were "egregious" legal errors in failing to have hearings on the modifications of peace bonds and failing to properly notarize affidavits related to peace bond applications, I believe a sanction less than removal from office would serve the interests of justice. The law related to peace bonds is less than clear. Most of the errors made relative to peace bonds occurred at the beginning of Justice of the Peace's term of office, although the effect of the errors spanned a longer time frame. There was no finding that the Justice of the Peace was motivated by family, social, political, or other relationships. It is my belief that there was insufficient proof respondent lent the prestige of his judicial office to advance his private interests or the interests of others. Further, on the record before the court, I am not convinced that the respondent issued orders in conflict with the jurisdiction of the district court.

SUPREME COURT OF LOUISIANA

NO. 2015-O-1691

IN RE:  JUSTICE OF THE PEACE LEROY J. LAICHE, JR.,
SECOND JUSTICE COURT, PARISH OF ASCENSION,
STATE OF LOUISIANA

JUDICIARY COMMISSION OF LOUISIANA


Hughes, J., dissents for the reasons assigned by Justice Weimer.